161 P.2d 878

CITY OF CLOVIS v. SOUTHWESTERN PUBLIC SERVICE CO.

No. 4875.

Supreme Court of New Mexico.

Aug. 29, 1945.

Rehearing Denied Oct. 3, 1945.

Jas. J. McNamara, of Clovis, for appellant.

Hervey, Dow, Hill & Hinkle, of Roswell, Otto Smith, of Clovis, Ben H. Stone, of Amarillo, Tex., and Chas. C. Crenshaw, of Lubbock, Tex., for appellee.

LUJAN, Justice.

This case arises out of the sale by the City of Clovis of its utility properties to New Mexico Utilities Company, the predecessor in interest and liability of defendant-appellee. The sale was made in the Fall of 1925 and was fully executed by the City at that time.

Appellant contends, under a number of assignments, that this sale was, and is, void (1) because it is generally violative of the Constitution; (2) because at the election wherein was submitted to the elec-

tors the question of the sale of the properties, the question of the sale of the electric property and the question of the sale of the water property were not separately submitted to the voters; and (3) that interest is due the City, in any event.

The question of duality, of the sale of the properties as a unit, although argued in the briefs, will not invoke a decision for the reason, as appellee points out, and as hereinafter shown, the trial court found: "The plaintiff in open court expressly abandoned its contention that the election of October 6, 1925, was void because of duality." Appellant prays for the return of the properties, for removal of cloud from its title, and for an accounting between appellant and appellee.

Should it be found that the contract of sale is valid, appellant prays the declaratory judgment of the court that appellee is, impliedly, indebted to appellant for certain interest. This claim is based upon the fact that part of the purchase price, viz., $130,000, was payable in twenty-four annual instalments of $5,416.66, each, and that no interest has been paid thereon.

Appellee denies that the contract of sale was invalid; and it denies owing any interest on the $130,000 by reason of an express contract between the parties that no interest was to be paid thereon.

Appellee also sets up affirmative defenses which it has designated (1) Validating Act; (2) Change of Legal Position and Estoppel by Record or Judgment; (3) Laches and Estoppel; (4) Substantial Compliance; (5) Statu Quo; and (6) Limitations and Adverse Possession.

The Court made findings of fact and gave as its conclusions of law all the conclusions requested, or relied upon, by appellee, and judgment was entered dismissing the complaint. The appeal follows.

Appellant, accordingly, is in the position of having its complaint dismissed because it failed to establish any of its alleged causes of action, and for the additional reason that appellee's affirmative defenses had been fully established.

The facts are undisputed. No attack is made upon the court's findings. The only questions presented to the court below, and now to this court, are questions of law.

New Mexico Utilities Company was the predecessor in interest and liability of appellee. It was incorporated under the laws of New Mexico in 1925, and, at the times herein mentioned, owned nothing but the electric property at Portales, New Mexico. All of its stock was owned by a holding company, the Missouri Power & Light Company, of St. Louis, Missouri.

In the course of negotiations for the purchase from the City of Clovis of its electric and water utilities, the Company, on September 4, 1925, submitted its offer of purchase in writing. Along with this letter there were transmitted: (1) Proposed contract of sale; (2) form of proposed street lighting contract; (3) form of proposed water service contract; (4) form of proposed electric franchise; (5) form of proposed water franchise; (6) form of pro-

posed pumping contract; (7) a comparative exposition of certain electric and water service rates; and (8) what is called "Exhibit G," which was a statement of the price to be paid the City for its utilities.

At this time the City of Clovis had outstanding bonds of the face value of $240,-000, not yet subject to redemption, the proceeds of which had been used by the City in the construction of its water and electric utilities.

The first issue of bonds, of the face value of $75,000 was dated March 1, 1909, and was due and payable on March 1, 1939, and were redeemable after twenty years from date. The second issue was of the face value of $50,000, was dated May 1, 1918, was due and payable May 1, 1948, and was redeemable at any time after May 1, 1938. The third issue was of the face value of $115,000, was dated May 1, 1920, was due and payable May 1, 1950, and was redeemable at any time after May 1, 1940. All issues bore six per cent interest, and the ordinances in all cases provided that taxes should be levied in sufficient amount to pay interest as due, and eventually, the principal.

On September 10, 1925, the proposed contract of sale which had been submitted to the City on September 4, 1925, was signed by the Mayor and City Commissioners. The contract of sale provided that (1) the City should sell its electric and water properties to the Company and should have an option to repurchase the water property on March 1, 1929; (2) the City should grant an electric franchise to the Company; (3) the City should grant a water franchise to the Company; (4) the City should contract to purchase from the Company all the electric power and light it would need for twenty-five years; (5) the City should contract to purchase from the Company all the water it would need for twenty-five years; and (6) the City should enter into a pumping contract with the Company in 1929, if it should exercise its option to repurchase the water plant and system.

The electric franchise ordinance was passed on October 9, 1925. It is identical with the proposed electric franchise ordinance submitted by the Company on September 4, 1925, despite the fact that the minutes of the city commission of September 10, 1925, recited that certain changes in contract and franchise forms submitted were desirable, and were likely to be made.

The water franchise ordinance was passed on October 9, 1925. It is identical with the proposed water franchise ordinance submitted by the Company on September 4, 1925. The street lighting contract was executed on October 9, 1925. It is identical with the proposed street lighting contract submitted by the Company on September 4, 1925. The water service contract was executed on October 9, 1925. It is identical with the proposed water service contract submitted by the Company on September 4, 1925.

The first point relied upon by appellant is that the contract of sale is void because it contravenes Sec. 14, Art. 9 of

the State Constitution in that the City lent its credit and made a donation to, and in aid of, appellee. The contract of sale between the City of Clovis and The New Mexico Utilities Company, appellee's predecessor in title, involved neither a loan of credit nor a pledge of credit, or a donation to, or in aid of, the Company. The record shows that the City of Clovis was unable to call and retire outstanding bonds in the face value of $240,000 (all of which bore 6% interest) prior to the 1st day of March, 1929, on account of the terms of said bonds.

Under the terms of the contract of sale the New Mexico Utilities Company was to pay to the City of Clovis as a part of the purchase price for such utilities the sum of $240,000 on March 1st, 1929. The New Mexico Utilities Company assumed the payment of the City's bonds in this amount, and to assure its discharge of that obligation gave to the City its non-negotiable bond secured by a deed of trust on the utilities which it was then acquiring from the City, for $240,000, bearing interest at the rate of 6% per annum, payable semi-annually and maturing on the 1st day of March, 1929.

This is one of the transactions which the City now contends amounted to a lending or pledging of credit in behalf of the New Mexico Utilities Company, and was a donation by the City on behalf of the company. The nature of this transaction partakes of none of said qualities, as we view it. We will discuss this contention under the subdivisions of (a) "Lending or Pledging of Credit," (b) "No Donation by the City of Clovis to New Mexico Utilities Company," (c) "Sale for Part Cash and the Balance on Terms or Credit does not Constitute a Lending or Pledging of Credit or a Donation," and (d) "Assumption by New Mexico Utilities Company of the Outstanding $240,000.00 bond issue Against the Water and Lighting Utilities did not Constitute a Lending or Pledging of Credit."

We hold that the agreement of the New Mexico Utilities Company to pay to the City of Clovis $130,000 in twenty-four annual instalments as a part of the purchase price of its light and water system does not constitute the lending or pledging of the credit of the City of Clovis to any person for the benefit of the New Mexico Utilities Company, within the constitutional prohibition.

The debts and liabilities of the City, and the burden on its taxpayers, were not increased. By such transaction it did not thereby become surety for, or guarantee the payment of, anything for which the utilities might have been liable to third persons. The credit, the ability to pay, there involved was no more than, and involved only, the credit of the utility company whereby it drew upon its credit in its agreement to pay to the City, and whereby it pledged its credit to the City, to assure such payment.

Nothing in this phase of the transaction possessed any element of guaranty, suretyship or pledge by the City of Clovis whereby the City became liable to do or perform any act or thing, or to incur any obligation, or

pay any sum of money, in behalf of, or for the benefit of, the utility company, or to become liable for, or assure the performance of, any obligation, or the discharge of any liability of the utility to any third person.

Clearly, the City of Clovis did not "lend or pledge its credit" to, or for the benefit of, the New Mexico Utilities Company. The most that it did was to give time to the New Mexico Utilities to pay part of its obligation under the purchase agreement; i. e. to give time to the New Mexico Utilities Company for the payment of an obligation owed by the New Mexico Utilities Company to the City of Clovis for a part of the purchase price for the light and water systems. This is an entirely different matter from the City of Clovis "lending or pledging" *its* credit. This, for the obvious reason that giving time for the payment of part of the purchase price created no liability whereby the City was liable to be called upon to discharge any direct, indirect or contingent, liability whatsoever. None of the contingencies which Article 9, Section 14 of the New Mexico Constitution was designed to prevent were here present.

In order to understand and interpret this provision it should be construed with reference to the evils it was intended to correct. The history of this sort of a constitutional limitation and the evils intended to be corrected are ably set out in Murphy v. Dever, 320 Ill. 186, 150 N.E. 663:

"The significance of the inhibition is found in the evil which it was intended to remedy. The demand for improved transportation facilities had developed a mania for extending public aid to private corporations. In order to aid in the construction of railroads, municipalities were subscribing for stock, issuing negotiable bonds as a means of paying the subscriptions, and taxing the inhabitants or the property within their limits to pay the indebtedness thereby incurred. While in specific cases it might be successfully contended that the public good will be served if the city can aid in the extension or improvement of transportation facilities, the poisonous by-products of such partnership arrangements have in the past far outweighed the temporary benefits." (Authority cited.)

Again in Bailey v. Tampa, 92 Fla. 1030, 111 So. 119, 120, it was said:

"The reason for this amendment was that, during the years immediately preceding it adoption, the state and many of its counties, cities, and towns had by legislative enactment become stockholders or bondholders in, and had in other 'ways loaned their credit to, and had become interested in the organization and operation of, railroads, banks, and other commercial institutions. Many of these institutions were poorly managed, and either failed or became heavily involved, and, as a result, the state, counties, and cities interested in them became responsible for their debts and other obligations. These obligations fell ultimately on the taxpayers. Hence the amendment, the essence of which was to restrict the activities, and functions of the state, county, and municipality to that of

government, and forbid their engaging directly or indirectly in commercial enterprises for profit."

The agreement of the New Mexico Utilities Company to pay to the City $130,000 in twenty-four annual instalments did not place any burden or charge against the revenues of the City, current or otherwise, and did not bring about any liability of the citizens of the City for the levy of any tax, or bring about any burden of any kind whatsoever upon the City of Clovis or its citizens, and, therefore, does not come within the purpose of the constitutional inhibition. No authority has been cited which would support the contention of appellant that the constitutional provision here under consideration was intended, or could be reasonably construed, as an obstacle which would prevent the sale by a utility of its propriety interests on terms, or for part cash and part on time. The City of Clovis was already the legal owner and holder of the water and electric light utilities, and instead of becoming interested therein was, by the sale, divesting itself of its interests therein.

The City also relies upon the point that, under the circumstances, there was a "donation" in violation of Article 9, Section 14 of the New Mexico Constitution, which prohibits "any donation to or in aid of any person, association * * * or private corporation * * *."

The circumstance, or circumstances, which the City of Clovis relies upon to establish a donation by the City to the New Mexico Utilities Company is, as we understand it, that the proclamation for the election, and the election notice, were silent as to whether the obligation would bear interest or would not bear interest, and therefore, to forego such interest would amount to a donation. The measure of the Company's liability for interest is controlled by Section 53-603 of the New Mexico Statutes, 1941, which is, in part, as follows:

"The rate of interest in the absence of a written contract fixing a different rate, shall be six (6) per cent per annum, in the following cases:

"First. On money due by contract."

The contract for the sale of the water and light systems by the City of Clovis as executed by the City of Clovis, its Mayor and Commissioners of the one part, and the New Mexico Utilities Company of the other, on the 10th day of September, 1925, in part, provided:

"The City agrees to proceed at once to submit this contract to the qualified electors of the City of Clovis and do all things necessary to secure a ratification of this contract as speedily as possible under the laws of New Mexico, and to pass all ordinances required to carry out the provisions of this contract. * * *"

The contract further provided, in part:

"Second: It is understood and agreed that should the election result in the ratification of the sale of said water and electric utilities to the Company that said City will grant coincident therewith a fifty year

franchise to the Company, granting the Company the right to construct, maintain and operate an electric light and power plant and/or transmission lines and distribution systems composed of poles, conduits, wires, etc., over, under, along and across all streets, alleys, thoroughfares, bridges and other public grounds of said City substantially in the form shown on Exhibit "A"; said "City shall also grant to the Company the right to construct, maintain and operate a water pumping plant and/or a water distribution system composed of pipes, valves, fittings, fire hydrants, meters, etc., beneath, above and across all streets, alleys, thoroughfares, bridges and other public grounds of said City substantially in the form shown on Exhibit "B", and said City further agrees to enter into a twenty-five year Street Lighting Contract with said Company substantially in form shown on Street Lighting Contract Exhibit hereto attached covering the complete requirements of said City for light and power and for street lighting; and said City also agrees to enter into a twenty-five year water service contract with said Company substantially in form shown on Water Service Contract Exhibit hereto attached covering the complete requirements of said City for water for fire protection and for sewer purposes in accordance with rates hereinafter mentioned. The Company agrees to supply said City as aforesaid all the necessary electric energy to meet the City's requirements and also water necessary for fire and sewer purposes substantially as shown in said Exhibits above mentioned."

It will be noted that the draft of the franchise was then in existence, was made a part of said contract by referring to it as Exhibit "A"; that it had been approved by the counsel for the City and was on file at the time of the execution of the contract of September 10, 1925; and is the draft of the identical franchise which was on file and referred to as Exhibit "A" and as contained in the franchise ordinance approved on the 9th day of October, 1925.

With relation to the payment by the New Mexico Utilities Company to the City of Clovis of the $130,000 in twenty-four annual instalments, and here under discussion, that franchise provides:

"That the full amount of the purchase price to be paid by Grantee is the sum of $449,115.24 at the time and in the manner herein agreed upon and upon the conditions agreed upon, to-wit: $240,000.00 face value of non-negotiable bonds or notes to be executed and delivered by the Grantee to the City as aforesaid, the Grantee agrees to pay the City for its Electric and Water Utilities the further sum of $160,000.00 in cash payable in amounts and at the dates hereinafter set out, to-wit:

"At the date of delivery to Grantee of deeds and other instruments of writing by the City sufficient to transfer, convey and deliver to Grantee together with the Street Lighting and Water Service contracts, and Water Franchise above mentioned in the sum of Thirty Thousand Dollars ($30,000.00).

"And the further sum of $130,000.00 payable in 24 equal annual installments of $5,416.66-2/3 per annum, said annual installments shall be paid on or before the first day of January of each and every year during the period commencing on the first day of January, 1927, and ending on the 1st day of January, 1950, *without interest.*" (Emphasis Ours.)

It will not be disputed that it remained for the utilities company and the City to agree upon the price for which the properties would, with the consent of the electorate, be sold. To omit the item of interest would not amount to a donation, if, it could be said, as it can be, that in fixing the price the parties to the contract could determine the ultimate sale price as it would be influenced by the fact the deferred payments would, or would not, bear interest. They chose to provide for no such interest in arriving at the sale price, and this is entirely unobjectionable when we assume, as we must, that this factor influenced the agreement as to the final purchase price, and the voters were sufficiently fully advised as to the purchase price and terms.

Exhibit "A" was, clearly, a part of the contract, and must be construed therewith. In 6 Ruling Case Law, page 851, sec. 240, we find the general rule thus stated:

"Moreover, the general rule is that in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in course of the same transaction, are, in the eye of the law, one instrument, and will be read and construed together as if they were as much one in form as they are in substance."

That which has already been said is sufficient to dispose of the contention that appellee is liable for interest on the $130,000 paid over a period of time in monthly installments. As we have said, the contract expressly provided that this part of the obligation would bear no interest. The contention of appellant that the statute in question, 1941 Comp. § 53-603, employs the term "due" as synonymous with "owing" and as distinguished from "presently payable," does not become important, and need not be further noticed, since the contract expressly provides that the $130,000 to be so paid in twenty-four annual installments shall be *without interest,* and hence there is no place for the operation of any implied contract to pay interest, however the statutory term "due" might be interpreted.

The appellant argues (and with some persuasiveness) that the language of the election proclamation was such as to create in the minds of voters a belief that the unsecured and unprovided for balance of purchase price of $130,000, payable in annual installments of $5,416.66⅔, each, was to bear interest and thus supports its contention that there was an implied promise to pay interest. If so, of course, the statutory rate of six per cent. would apply, 1941 Comp. § 53-603.

Reliance for the contention rests on a recitation in the proclamation reading:

"whereas, under the laws of New Mexico the city receives only 1½ per cent. on its sinking fund," viewed in the light of a reservation in the contract of sale of the right to accelerate the maturity of these annual installments and pay them all at once, if desired. The appellant pertinently inquires: "Why the reservation of right to accelerate maturities unless to stop interest?" Now that question is apt as well as significant and merits a plausible answer, if one can be supplied, as we think it can.

In the first place, the language quoted last above from the election proclamation was used by the draftsman in immediate connection with a recitation disclosing the purchaser's desire to pay all cash for the city's water and light utilities and a showing that such an arrangement was unwise and impractical because of the delayed maturity of the $240,000 bond issue outstanding upon which interest was accruing at 6 per cent. In other words, if the city accepted cash, it could only get 1½ per cent interest on the moneys received, whereas it must pay out 6% on the amount of it equal to the bond issue. Unquestionably, the mind of the draftsman of this language in the election proclamation was centered on the disadvantage of accepting cash for which only 1½ per cent interest could be secured, whereas an equivalent of $240,000 in amount thereof would be drawing the 6 per cent. interest stipulated in the bonds.

Obviously there was no intent to mislead and since the purchaser, for the reason stated, was denied its preference of paying all cash, the reservation of a continuing right to pay the $130,000 in cash at any time at purchaser's option may not unreasonably be related to matters quite distinct from a wish to curtail the running of interest. It will be remembered that the appellee was to issue bonds of the face value of $240,000 bearing 6 per cent interest to mature in 1929 when $75,000 of the outstanding city bonds of the same aggregate amount became callable. This bond issue of appellee was to be secured by a deed of trust on the electric and water utilities purchased which would provide, among other things, for an adjustment in 1929 between the city and the purchaser for the purpose of releasing the electric property from the deed of trust and also to permit the city, at its option, to repurchase the water plant and system at a stipulated price.

The adjustment referred to would coincide in point of time with the date when $75,000 of the city's bonds became callable and with any exercise by the city of its option to repurchase the water system and plant. Thus the reservation of the right to accelerate maturity of the deferred installments is explainable at least, in part, as a survival in the final arrangement reached by the parties, as to $130,000 of the purchase price, of purchaser's initial proposal to pay all cash, now broadened into a privilege of paying in cash at any time within the period of installment maturities. Furthermore, in view of the 1929 adjustment provided for, the purchaser may very well have felt it might wish to avoid having any unsecured indebtedness survive the adjust-

ment and, accordingly, reserved to itself the option to retire unmatured installments at any time.

The parties either did or did not agree that the deferred balance of $130,000 was to be without interest. The trial court found there was an agreement not to pay interest based upon the intention of the parties at the time the contract was signed. The finding cannot be said to be without support in the evidence. The stipulation in the electric franchise ordinance that the installment payments were to be "without interest" unquestionably evidences this agreement and intent. Accordingly, any language in the election proclamation informing the electorate that the deferred balance was to bear interest would be in open breach of the agreement, false and fraudulent. The trial court found no fraud, nor is it seriously urged there was any. Hence, it is our duty to square the language of the election proclamation with the existence of an agreement not to pay interest, found by the court and recited in the electric franchise ordinance, if the same reasonably can be done.

The explanation given the questioned language in the election proclamation hereinabove, while not altogether satisfactory, is to be preferred to the alternative view which would read from it an implied promise to pay interest, at the same time blinding itself to presence in the electric franchise ordinance of the words "without interest" which, observed and noted, would constitute actionable fraud sufficient, unless ignored, to void and completely nullify a sale acquiesced in by all parties concerned for nearly a quarter of a century.

We find no basis for any intimation that the contract with reference to interest was changed after its execution on September 10, 1925, either before or after the election of October 6, 1925, or at any other time. The minutes of the meeting of the 10th of September, 1925, when the city commission had before it, considered and approved, the proposed contract of sale of the water works, electric light and electric distribution system, and the meeting of October 9, 1925, after the election approving the sale had been held and when the ordinances granting water and electric franchises, identical in form and language with the franchises on file with the Commission and considered by it on September 10, 1925, when the sale was agreed upon, will not support the contention of the City that the contract as originally drawn was silent as, to interest and, therefore, that the provisions of 1941 Comp. Sec. 53-603 apply and operate to create an implied agreement to pay interest. So, there never having been any obligation to pay interest under any theory relied upon, there could have been no donation of such obligation or a release thereof as contended for by appellant.

Does a sale for part cash and the balance on terms constitute a lending or pledging of credit, or a donation? We think not. Chapter 79 of the Laws of 1921, 1941 Comp. Secs. 14-4301, 14-4305, provides for authority to "sell and convey or lease any water-works plant, includ-

ing entire water-works systems, light plant, sewer systems, buildings or other municipal property belonging to such municipal corporations * * * " and for the manner of calling and holding the election to secure the voters' consent to the sale.

█ Clearly the statute authorizes the sale of utilities by municipal corporations either for cash, or for part cash and part time, or on credit. There is no restriction placed, or even suggested, by any language to be found in the statute. It is provided therein that the proclamation calling the election shall set forth "the proposed sale * * * *the amount of the* *purchase-price to be received,* if a sale, * * * and the *terms* of such contemplated sale · * * *." (Emphasis ours.) We construe the language of the statute which requires "the amount of the purchase-price to be received" and "the terms of such contemplated sale," to mean simply that the proclamation for the election must advise the voters of the amount of the purchase price, the manner in which, and the time when, such purchase price shall be paid. There was no violation of this condition involved in the election in question. Reference is made to the following cases interpreting like statutes under similar circumstances where the question arose as to the meaning of like language:

█ In the case of Nakdimen v. Ft. Smith & Van Buren Bridge Dist., 115 Ark. 194, 172 S.W. 272, 275, the court had under consideration the statute of the State of Arkansas which provided "The commission shall have the power to grant a right of way over said bridge to any public utility upon such terms as the commission shall determine: * * *." There the court held that the word "terms" has reference to the "time and amount of money paid, but that a discretion was left to the commissioners as to the amount of money to be charged therefor and the times of payment thereof."

In the case of City of Richmond v. Virginia Ry. & Power Co., 124 Va. 529, 98 S.E. 691, 693, the Virginia court had under consideration the meaning of the word "terms" as employed by the Common Council of the City of Manchester in making sale of the "Commons, including the water power * * * of said city, by such mode and upon such terms as said common council shall deem proper," and there the court stated: "The word 'terms' may have a broad meaning, it is true, and might be given the meaning contended for by the appellee in the case before us. But, to say the least, such language is equally susceptible of the construction that the terms referred to are merely the terms of payment of the purchase money, including the manner of securing any deferred payments, * * *."

The word "terms" when used in connection with power of sale was likewise discussed in Murphy v. Green, 102 Fla. 102, 135 So. 531, 533, and there the court said: "The words 'terms and conditions' in the sale of property usually have a definite meaning; namely, the amount, time, and manner of payments." See also People

v. Middleton et al., Commissioners, 14 Cal. 540; and Newark v. Elliott, 5 Ohio St. 113.

Touching further upon Appellant's general challenge to the constitutionality of the sale, under point one, additional authorities may be noticed, and cited.

█ Under the title "Municipal Corporations," 44 C.J. at § 4095, p. 1152, we find the following statement:

"Constitutional provisions prohibiting a municipality from making donations or lending its credit to, or subscribing to the stock of, private corporations do not operate to forbid a municipality to construct, own, sell, or lease a public utility, * * *."

And, we find in 1 McQuillan on Corporations, Section 206, where a discussion of such constitutional language is involved, this statement:

"Such a provision, it is held, applies only to the union of public funds and private capital or credit in an enterprise, and will not prevent a city from establishing its own gas work to supply light and heat for its citizens, or providing its own water works, sewerage system, lighting system, airport, or maintaining a zoological park."

"The purpose of the constitution is to forbid investment of public funds in private enterprises. Johnson v. District No. 1, 128 Or. 9, 270 P. 764 [273 P. 386]."

See also 44 Corpus Juris at page 1149; Murphy v. Dever, 320 Ill. 186, 150 N.E. 663; Churchill v. City of Grants. Pass, 70 Or. 283, 141 P. 164; Admiral Realty Co. v. City of New York, 206 N.Y. 110, 99 N.E. 241, Ann.Cas.1914A, 1054.

Article 9, Sec. 12, of the New Mexico Constitution authorizes the legislature to enact laws empowering municipalities to issue bonds for purposes public in nature, for the levy of a tax, with a limitation of 12 mills on the dollar, on all taxable property within a municipality and to extinguish the principle of such debt within fifty years, and to provide for the submission to a vote of the qualified electors of such municipality the question of incurring such indebtedness. The legislature thereafter passed an act authorizing the incurring of such indebtedness, providing for an election upon the question, etc.

It cannot be said, therefore, that the issuance of the bonds of the City of Clovis many years before the sale of its water and light property to The New Mexico Utility Company was not regular and within the authorization of the constitution and the statute. Any lending or pledging of the city's credit by the bond issue involved was to the holders of the bonds who furnished the money, and not to the utilities company. This credit was pledged, in the terms of the bonds, as authorized by the constitution and statute, long before the utilities company ever contemplated any transaction with the City of Clovis for the purchased property. Clearly the purchase of the water and light systems from the City did not increase the outsanding loan or credit by the city. to the bondholders. The utilities company did pledge *its*

credit to the City in the form of the assumption of the outstanding bonds and by the giving of its own non-negotiable bonds payable to the City in equal amounts of $240,000 which, to that extent, in fact, lifted the common burden and obligation of the taxpayers of the City to redeem, through taxation, the debt owing to the bond holders.

The City of Clovis has never questioned the validity of its water and light bonds but has now paid them off in their entirety and out of the proceeds of the payments made by the Utilities Company on its $240,000 bonds executed at the time of purchase in favor of the City.

To sustain the appellant's theory would be to say that so long as the bond issues were outstanding—and it must be borne in mind that they were not yet redeemable or subject to being called at the time of the sale in 1925—it could not, as a practical matter, sell its utilities for cash *or* credit, however unable the City might be to serve the public with the utilities, and regardless of the financial loss the City might incur from their further operation.

The contention of appellant seems to be that since the properties sold were acquired through the City's credit, they could not thereafter be sold, while the bonds originally issued for the purpose were outstanding, since this, by giving the purchaser of the properties a right to itself assume and pay off the bond obligations, would be, in a manner, permitting the utilities company to profit, indirectly at

least, by the credit and confidence reposed by the bondholders in the City in the first instance. The City's able counsel, in its thorough and exhaustive brief, suggests a number of examples which he thinks are analogous, and which he thinks would clearly fall under the constitutional ban. One of these is the situation where the city would issue its bonds for $240,000 and turn them directly over to appellee for the purpose of construction by appellee of privately owned utilities, which sum was to be, under contract, thereafter repaid to the city. Clearly, says appellant, this would be a lending of credit or a donation within the constitutional prohibition. And, we so agree. But we do not have any such situation here.

There is no element to be found in the present circumstances where it can be said to appear that the city has financed the utilities in the purchase, or operation, of the properties in question. Certainly it cannot be said that when these original bond issues were voted and the obligations incurred, the city had then any present intention of disposing of the properties, if that could make a difference. The fact that some sixteen years after the first bond issue, and some five years after the last one of 1920, the city, supported by the vote of its qualified electorate, determined to dispose of the properties as it was by law so authorized to do, could not, under the circumstances, be held to violate the constitutional provision in question. The bonds were not subject to call and could not have been redeemed as yet. The City chose

what it thought was the best way to secure the payment of the purchase price for the properties sold and the best method of liquidating the $240,000 bond obligation for which the City became responsible many years before a sale of the properties constructed by the sale thereof was thought of.

The many cases cited by appellant do not sustain his contention that there was here a pledging, or lending, of credit, or a donation, by the city to the appellee's predecessor in title, the Utilities Company. Counsel for appellee have very ably noticed and distinguished substantially all cases relied upon by opposing counsel. We do not feel that further notice of those cases, and of the distinctions to be drawn, is necessary.

Under Point 2 appellant argues that the contract of sale was void because it violates Sec. 4, Art. 8 of the state constitution, which reads as follows:

"Any public officer making any profit out of public moneys or using the same for any purpose not authorized by law, shall be deemed guilty of a felony and shall be punished as provided by law, and shall be disqualified to hold public office. All public moneys not invested in interest-bearing securities shall be deposited in national banks in this state or in banks or trust companies incorporated under the laws of the state, and the interest derived therefrom shall be applied in the manner prescribed by law. (As amended Nov. 3, 1914.)"

Under the facts in this case we can find no such violation. There is no evidence that the city loaned any amount of its funds to appellee, as contended for by appellant. Insofar as any objection is directed to the $240,000 which is evidenced by the nonnegotiable bond payable to the City of Clovis, it need only be noticed that no part of that amount was paid over in cash at the time of the consummation of the transaction and sale and the city never had such amount, or any part thereof, to place upon deposit as provided for under the section of the constitution in question. Appellant cites no authority which would support its contention in this respect. The city never had in its possession any part of the proceeds of the $240,000 bond represented by the company's nonnegotiable obligation running in favor of the city and therefore it had no money in its possession which it was, under the constitutional provision, Art. 8, sec. 4, obligated to invest. This point is without merit.

The fact that it might have dealt with the purchaser so as to have taken the cash instead of six percent interest-bearing bonds, as it did, and thus would have had some part, or all, of the $240,000 on hand to invest cannot change the picture to the detriment of the appellee. The fact is the City chose what it thought was the better way of handling the matter. It had to pay six percent interest on its outstanding bonds which the company was to assume and pay off. It chose to balance the account by accepting, instead of cash which doubtless it

felt could not have been invested at so high a rate, secured bonds of the purchaser which produced for the City the 6% in interest.

We are not intrigued by the suggestion that the City had paid more in interest upon the bonds than it received. In the first place, such claim does not find support in the record. And there is no proof that the City paid any interest on the $75,000 bond issue or on the $50,000 bond issue subsequent to March 1, 1929. Certainly the utilities company at no time received any interest, nor the benefit thereof; all interest paid under the obligation was incurred by the city long prior to the time of the sale, and was paid, of course, to the bondholders themselves, the original obligees.

Under Point 3 appellant challenges the legality of the contract of sale, contending it is void because, under it, the City used funds raised by taxation for the benefit of appellee. This point, involving substantially the same principles of law as are discussed under Point 1, is without merit and, likewise, needs but slight notice in addition to that which has already been given to a like question under the first point. This contract presents no situation where taxes are imposed for a private purpose.

Under Point 4 the question raised is that since the sale for both the water property and the electric property was submitted to the voters as a single proposition, with no right of voting for or against the separate sale of only one of such properties, that the sale attempted was void.

An interesting question is here presented, but it is not one which will, under the circumstances, draw a decision from this court, as it did not from the lower court. The point was waived by counsel for appellant at the close of the trial below. The trial court made a specific finding to the effect that "The plaintiff in open court expressly abandons its contention that the election of October 6th, 1925, was void because of duality." True, both appellant and appellee fully brief the point for this court; but appellee calls our attention to the trial court's finding above noticed early in its brief, and, before the point is by it discussed, and thus, plainly, shows its reliance upon abandonment. Obviously the trial court was never called upon to determine that issue, and we must here treat it as if it were never raised since the finding of abandonment is amply supported by the record. We are at a loss to understand how appellant should have urged the point here, or, why appellee should have felt called upon to do more than to call our attention to the fact, and the finding, of abandonment.

The record discloses the following:

"The Court: Mr. McNamara, are you urging the duality of the election and sale?

"Mr. McNamara: No, sir, I am not. It is a question of the city extending its credit and the question of the interest. I am going to drop the question of duality.

"Mr. Smith (for appellee): You are abandoning the question of duality?

"Mr. McNamara: Yes, I am abandoning it.

"Mr. Stone & Mr. Dow (in unison): You say you are abandoning the question of duality?

"Mr. McNamara: Yes."

It is difficult to imagine a clearer expression of intention than is to be found in the above statement of counsel for appellant.

Appeellee rather exhaustively presents the proposition that, in any event, and even though some of the matters and things relied upon by appellant as making void the contract of sale because of a violation of the constitutional provision in question might be found to exist, nevertheless, the City, by its conduct over the years, has waived, or is estopped to rely upon, such irregularity, if any there be.

We are called upon by appellee to notice that this contract of sale was entered into on September 10, 1925; that the contract was executed by the Mayor and City Commissioners and by the New Mexico Utilities Company; that it provided for a consideration of $406,664.42, of which $30,000 was paid in cash; $240,000 by the assumption of the then outstanding utility bonds issued by the City; and the balance by the obligation to pay $130,000 in equal instalments of $5,416.66 each; that the City has stood by and received the $30,000 cash payment, and has permitted the New Mexico Utilities Company and its successors to pay the $240,000 bond issue, with interest, and to pay not less than 22 of the $5,416.66 annual instalments aggregating the balance of the purchase price of $130,000; and has further permitted, if it has not invited, the New Mexico Utilities Company and its successors to extend its transmission lines at a cost to it of some $336,500, to expend on said system a total aggregate, less retirements, of $649,639.14; all of this without once questioning the regularity of said election or the validity of said sale until the filing of this suit.

We do not deem it necessary, however, to consider these matters or to pursue the inquiry touching the question of waiver and estoppel, or other of such special defenses, to the point of a decision. Once it can be said, as we do say, that there is no merit to any of the contentions relied upon by appellant—that all questions presented by appellant city were correctly resolved by the trial court against it—it becomes unimportant to determine whether, had there been a violation of law, constitutional or statutory, appellant city would be, under the circumstances noted by appellee, estopped to rely upon them, or whether other special defense urged be good.

Finding no merit to any of appellant's assignments and contentions, the judgment will be affirmed, and

It is so ordered.

MABRY, C. J., and SADLER and BRICE, JJ., concur.

BICKLEY, Justice (concurring in part and dissenting in part).

I concur in many of the conclusions stated in the foregoing opinion, but I am unable to concur in the decision which denies to the appellant the right to recover any interest on the deferred payments of $130,000.

The contract of sale was made with the electors. After many studious readings of the election proclamation I am convinced that there is but one reasonable implication to be drawn therefrom, which is, that if the electors approved the sale of the properties such interest would be forthcoming.

What the draftsman of one paper may have interpreted the language of another paper to mean is of little importance. What the officers of the city may have intended when the contract was signed is of little importance. The important thing is that a reading of the election notice which was essential to inform the voters of the "terms of such contemplated sale," and without which notice an election to secure the approval of the electors cannot be had, advised such electors that this interest would be paid.

The prevailing opinion says this position of the appellant is argued persuasively and deserves "a plausible answer." I do not find the attempted answer either plausible or persuasive and I cannot accept it.