622 P.2d 276

**MASTER BUILDERS, INC.,**
Plaintiff-Appellee,

v.

**James W. CABBELL, Sr. and Johelen Cabbell, his wife,**
Defendants-Appellants.

**James W. CABBELL, Sr., Johelen Cabbell and Cabbell, Inc., a New Mexico Corporation d/b/a Jim Cabbell Agency,** Plaintiffs-Appellants,

v.

**MASTER BUILDERS, INC.,**
Defendant-Appellee.

No. 4387.

Court of Appeals of New Mexico.

Dec. 9, 1980.

Certiorari Denied Jan. 19, 1981.

Prentis Reid Griffith, Jr., Griffith & Cruse, Los Alamos, Sumner S. Koch, White, Koch, Kelly & McCarthy, Santa Fe, for defendants-appellants.

Michael Golden, Moore & Golden, Santa Fe, for plaintiff-appellee.

## OPINION

LOPEZ, Judge.

This is an appeal from a judgment quieting title to certain land in Master Builders, Inc., and denying specific performance to the Cabbells on an option agreement between Mr. Cabbell and Master Builders to purchase that land. We affirm the judgment of the trial court.

The pivotal issue is whether two written agreements between the same parties, executed at different times but concerning part of the same subject matter should be read together as one contract when neither document refers to the other. We hold that, in the circumstances of this case, they should not be read together.

The first agreement was entered on February 27, 1976 by Master Builders and Pioneer Development, Inc. (Pioneer) for the purchase of certain undeveloped real property in Los Alamos County, part of which is the subject of this suit. The agreement provided that Pioneer would sell the land to Master Builders for $350,000 and that, among other things, the Jim Cabbell Agency would have the exclusive right to list and sell lots from the subdivision of the property and would receive a 4½% commission on the sales. James Cabbell, Sr. was the sole shareholder in Pioneer and sole proprietor of the Jim Cabbell Agency, an unincorporated real estate brokerage agency. About the same time that the Pioneer purchase

agreement was signed, Pioneer was dissolved, and Mr. Cabbell succeeded to all the right, title and interest in the assets of Pioneer. On purchasing the property, Master Builders divided it into four sections, called Units A, B, C, and D, and began to subdivide the units. The Jim Cabbell Agency received a 4½% commission on all lots sold in Units A, B, and C.

The second agreement was entered on April 21, 1977 between Master Builders and James Cabbell, Sr. For consideration of $14,000, Cabbell was granted the option to purchase all 14 lots of Unit D subject to the final approval of the Plat by Los Alamos County. The agreement specified that Cabbell would pay $16,000 per lot if he chose to exercise the option and that the $14,000 would be applied to the price of the lots as down payment. Although no time was specified for the exercise of the option, the court found that the parties intended the option to be exercised within a reasonable time, which it construed to be ninety days from the time Cabbell was notified that the county had approved the Plat. These findings are not challenged. Master Builders notified Cabbell by letter dated October 20, 1977 that the county had approved the Plat on October 6th. After the option was signed, a dispute arose concerning its terms, Cabbell asserting that he was entitled to his 4½% commission on the sale of the lots to himself and Master Builders claiming the contrary. No reference to the Pioneer purchase agreement is found in the option agreement.

On February 6, 1978, Master Builders filed suit to quiet title on the property in Unit D. The Cabbells and Cabbell, Inc., now owners of the Jim Cabbell Agency, in turn sued Master Builders. The Cabbells sought specific performance on the option agreement; Cabbell, Inc. requested the real estate commission allegedly due on the sale; and Master Builders counterclaimed for damages for slander of title. The cases were consolidated for trial. Title was quieted in Master Builders, and all other claims were denied. Hereafter, unless clarity requires otherwise, James Cabbell, Sr., the Jim Cabbell Agency, or Cabbell, Inc., will be referred to simply as "Cabbell".

Cabbell contests the trial court's findings that he sought to modify the option and that he never agreed to exercise it according to its terms. He admits, however, that he never advised Master Builders that he would exercise the option without deducting a real estate commission from the agreed purchase price of $16,000 per lot, and that the commission as applied to this transaction, was not discussed by the parties until after the option agreement was signed. Before we can determine whether or not the court erred in finding that Cabbell never agreed to exercise the option according to its terms, we must decide what those terms were.

The option agreement says nothing about a real estate commission; the Pioneer agreement specifies that a commission shall be paid on each lot sold. The question is whether the contracts should be construed as one instrument. Since James Cabbell was sole proprietor of Pioneer, we consider that both agreements were between the same parties.

In *City of Clovis v. Southwestern Public Service Co.*, 49 N.M. 270, 161 P.2d 878 (1945), the Supreme Court said:

> [T]he general rule is that in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction, are, in the eye of the law, one instrument, and will be read and construed together....

49 N.M. at 279, 161 P.2d at 883. The rule enunciated there is not applicable to the instant case because the two instruments were not executed in the course of the same transaction, nor at the same time. One instrument involved the sale of a large parcel of land; the other involved the repurchase of part of that land by the original vendor fourteen months later.

Another situation in which two documents are properly construed together is when one or both documents refer to the other, as was the situation in *Bass v. Occi-*

dental Life Insurance Co., 19 N.M. 193, 142 P. 798 (1914). Again the situation before us falls outside of the scope of that rule since neither document refer to the other.

When as here, two documents are executed by the same parties and concern part of the same subject matter, although not involving the same transaction, the issue of whether they should be treated as a single contract is determined by considering the intent of the parties manifested at the time of contracting and viewed in light of the surrounding circumstances. See generally, Dynamics Corp. of America v. International Harvester Co., 429 F.Supp. 341 (D.C., 1977). The surrounding circumstances indicate that the parties did not intend the first contract to be incorporated into the second one.

Since in the second transaction, Cabbell was the purchaser as well as the broker, any brokerage commission paid would have the effect of lowering the purchase price. His testimony that he knew that Master Builders would not accept less than $16,000 per lot as part of the option agreement indicates that Master Builders, at least, did not intend a brokerage commission would be paid. The fact that Cabbell accepted the $16,000 per lot purchase price without specifying that he would receive the 4½% commission indicates that he agreed to pay a total of $16,000 per lot, if he should decide to exercise the option. Moreover, as the broker, Cabbell had a fiduciary duty to reveal all facts which he should realize would be likely to affect the judgment of his principal in deciding whether to agree to the specified terms of the transaction. Iriart v. Johnson, 75 N.M. 745, 411 P.2d 226 (1965). The fact that Cabbell, who drafted the option agreement, failed to mention a brokerage commission, either explicitly, or by reference to the earlier agreement, indicates that he did not intend, anymore than Master Builders did, that the commission would be forthcoming in this transaction. The court must consider the mutually expressed assent and not the secret intent of a party to be the intention of the contracting parties. State v. Pecos Construction Co., 86 N.M. 58, 519 P.2d 294 (1974). The circumstances indicate that the parties did not intend that the contracts should be construed together.

An option must be exercised strictly according to its terms. Richardson v. Casey, 6 Ariz.App. 141, 430 P.2d 720 (1967); Nance v. Schoonover, 521 P.2d 896 (Utah 1974); see, Cillessen v. Kona Co., 73 N.M. 297, 387 P.2d 867 (1964).

The terms of the option are fully set out in the option agreement. The payment of a brokerage commission is not one of the terms. By insisting that he would take his 4½% brokerage commission when he exercised his option to purchase Unit D, Cabbell was changing the terms of the option agreement. The trial court's findings to the effect that Cabbell sought to modify the option and never agreed to exercise it according to its terms are supported by substantial evidence. Failure to exercise an option results in its loss. Id. The trial court did not err in refusing to order specific performance on the option contract and in quieting title in Master Builders.

The judgment of the trial court is affirmed.

IT IS SO ORDERED.

ANDREWS, J., concurs.

SUTIN, J., specially concurring.

SUTIN, Judge (specially concurring).

I concur in the result.

The trial court made the following pertinent findings of fact:

\* .\* \* \* \* \*

4. Jim Cabbell Agency is a licensed New Mexico real estate agency and James W. Cabbell, Sr., is a licensed New Mexico real estate broker who is employed by Jim Cabbell Agency.

\* \* \* \* \* \*

6. On February 27, 1976, Pioneer Development, Inc., entered into a written real estate sales agreement with Master Builders, Inc., whereby Master Builders,

Inc. agreed to buy the land described . . . .

7. The said written sales agreement . . . also provided:

A. That Jim Cabbell Agency was given an exclusive agency with the sole right to list and sell lots from the subdivision of the property at 4½% of the gross sales price as a commission . . . .

\* \* \* \* \* \*

8. On February 20, 1976, Pioneer . . . agreed to dissolve the corporation and the sole shareholder . . . Cabbell, Sr., became the owner of all assets of the corporation . . . .

9. It was contemplated . . . at the time of the signing . . . that Master Builders . . . would acquire the tract of land . . . and would apply to the County of Los Alamos for plat approval . . . and after county approval was obtained, Master Builders . . . was to make certain improvements . . . to develop it for sale and then sell the lots to the general public through . . . Cabbell . . . .

10. . . . Master Builders . . . after acquiring title to the real estate . . . subdivided the land . . . into four separate subdivision units, denominated Units A, B, C, and D . . . .

11. The County of Los Alamos approved the subdivision . . . and the last unit, (Unit D) was approved in October, 1977.

12. At the time the County . . . approved Unit D all of the lots in Subdivision Units A, B and C had been sold by Master Builders . . . .

13. On each lot . . . Cabbell . . . was paid a commission for the sale of those lots in accordance with paragraph 3 of the purchase agreement, dated February 27, 1976 . . . .

14. . . . Cabbell . . . purchased four lots in Units A and B and took title . . . and Master Builders . . . signed closing statements which specifically indicated that . . . Cabbell . . . was receiving a commission . . . in accordance with paragraph 3 of the written purchase agreement.

15. On April 21, 1977 . . . Master Builders . . . in consideration of the sum of $14,000.00, executed a written agreement with . . . Cabbell . . . entitled option to purchase . . . which . . . granted an option to . . . Cabbell . . . to purchase the fourteen lots which were to be included in . . . Unit D . . . .

\* \* \* \* \* \*

17. The option agreement . . . was prepared by . . . Cabbell . . . and failed to specify any deadline for the exercise of such option by him and the option did not specify the manner by which notice was to be given by writing, and the option further stated "In the event the option is not exercised as set out above, 'Buyers' [Sic] agree to forfeit the fourteen thousand dollars ($14,000.00) option money to "sellers" . . . ."

18. The option to purchase agreement, contained no provision for a real estate brokerage Commission to be paid or deducted from the option price.

19. [I]t was the intention of the parties and by their conduct and actions that such option could be exercised within a reasonable time and in a reasonable manner.

20. . . . and . . . contemplated that a reasonable time . . . was 90 days following notice to . . . Cabbell . . . of the approval . . . of Unit "D" . . . .

21. . . . on October 6, 1977.

22. Subsequent to the approval . . . Master Builders . . . gave written notice by letter dated October 20, 1977 . . . .

23. Following receipt by . . . Cabbell . . . Cabbell . . . notified . . . Master Builders . . . that he desired to exercise his option subject to a deduction from the purchase price . . . for all or part of a 4½% sales commission . . . .

\* \* \* \* \* \*

25. At no time . . . did . . . Cabbell ever agree orally or in writing to exercise such option agreement without placing qualifications . . . .

26. . . . Cabbell . . . insisted that there be added a qualification . . . con-

cerning a right to purchase price deduction . . . .

\* \* \* \* \* \*

28. . . . Master Builders . . . never agreed to a closing . . . at a price or subject to any terms not expressly specified in the option agreement itself.

\* \* \* \* \* \*

33. . . . Cabbell . . . was serving as a real estate broker for Master Builders . . . and as such was under a duty to disclose any facts within his knowledge to his principal, which would affect the sole [sic] [sale] price of the land except as otherwise provided in the written option.

\* \* \* \* \* \*

Cabbell claims that "THE TRIAL COURT ERRED IN FINDING AND CONCLUDING THAT THE OPTION AGREEMENT WAS AMBIGUOUS." He points to Conclusion No. 6 which reads:

The failure to include any reference in the option agreement to the right of . . . Cabbell . . . to deduct from the purchase price a sales commission, created an ambiguity, which should be strictly construed against the maker of such agreement, (*Schultz & Lindsay Construction Company v. State*, 83 N.M. 534, 494 P.2d 612.)

Whether an ambiguity or uncertainty exists in a contract is one of law. *Jernigan v. New Amsterdam Casualty Company*, 69 N.M. 336, 367 P.2d 519 (1961); *Yarbro v. Koury*, 72 N.M. 295, 383 P.2d 258 (1963).

An ambiguity arises in a written instrument *if the language used is fairly susceptible of two different constructions by reasonable intelligent men on reading it.* Houston Fire and Cas. Ins. Co. v. C and H Const. & Pav. Co., 82 N.M. 799, 487 P.2d 908 (1971); *Alvarez v. Southwestern Life Insurance Co., Inc.*, 86 N.M. 300, 523 P.2d 544 (1974). None of the language used in the option agreement was subject to this test.

An omission in a written instrument that "created an ambiguity" does not create an ambiguity in the instrument itself if it is otherwise clear and unambiguous. In other words, the omission in the option of any reference to payment of a commission did not create an ambiguity. If no provision is made for payment of a commission, none exists. Parol evidence to contradict or vary its terms is prohibited. *Armijo v. Foundation Reserve Insurance Company*, 75 N.M. 592, 408 P.2d 750 (1965). Thus, an omission or mistake is not an "ambiguity" in a contract within the parol evidence rule. *Michigan Chandelier Co. v. Morse*, 297 Mich. 41, 297 N.W. 64 (1941). The option agreement was not ambiguous.

Perhaps the court meant that, based upon its findings, Cabbell was entitled to a commission on sales of lots in the written sales agreement; that no such provision was contained in the option agreement; that an ambiguity was created in the written sales agreement as to whether its language would include payment of a commission for sale of lots to be purchased in the option agreement; and that the written sales agreement is susceptible of two different constructions. It reads in part:

3. . . . CABBELL . . . shall have an . . . exclusive right to list and sell lots from the subdivision of the property which is the subject of this agreement and . . . CABBELL . . . shall be paid four and one half percent of the gross sales price as a commission . . . .

This language is clear and unambiguous. If Cabbell sells lots in the subdivision, a commission is due and payable.

There is no ambiguity present in either contract. The fact that an erroneous conclusion of law is made does not bear on the result of the judgment. It was superfluous.

In *Hondo Oil & Gas Co. v. Pan American Petroleum Corp.*, 73 N.M. 241, 245, 387 P.2d 342 (1963), Justice Moise wrote:

. . . It is well settled in New Mexico that where the language of a contract is clear and unambiguous, *the intent of the parties must be ascertained from the language and terms of the agreement,* [citations omitted] and in this connection all parts of the instrument shall be given effect so as to make all provisions of the document reasonable and harmonious. [Emphasis added.]

Parol evidence is inadmissible to show such intention. *Hoge v. Farmers Market & Supply Co. of Las Curces*, 61 N.M. 138, 296 P.2d 476 (1956). The terms of a contract, where unambiguous, are conclusive. *Fuller v. Crocker*, 44 N.M. 499, 105 P.2d 472 (1940).

These rules compel the conclusion that under the sales agreement Cabbell was entitled to a commission if he actually sold lots in the subdivision. The agreement made no reference to a commission that would arise out of any option agreement. Cabbell did not sell any lots in Unit "D." He prepared an "Option to Purchase" to purchase the lots in which Master Builders gave him "an option to purchase the proposed 14 lots (Unit "D", as proposed) . . . ." Cabbell was not an agent of Master Builders in selling the lots to himself under the option agreement. Cabbell dealt directly with Master Builders independent of the sales agreement. Under this relationship, Cabbell was not acting as a fiduciary for and on behalf of Master Builders. He testified that he was acting as a "buyer-investor."

Cabbell states:

The Court's finding that Mr. Cabbell was acting as a real estate broker for Master in preparing the Option Agreement is questionable. *We contend there is not substantial evidence in the record to support this portion of Finding 33. The option itself does not reflect that Mr. Cabbell acted as a broker.* . . . [Emphasis added.]

Furthermore, the "Option to Purchase" provided:

IT IS UNDERSTOOD "Buyer" will pay to "Seller" Sixteen Thousand Dollars ($16,000.00) per lot, *if said option is exercised.* [Emphasis added.]

An "Option to Purchase," in its inception, is neither a sale of land nor an interest therein, nor an agreement to sell. The optionor does not sell his land, nor agree to sell it. He sells the right or privilege to buy at the option or election of the other party. By acceptance of the option, it is transformed into a mutually binding contract to sell and to buy. *Neely v. Denton*, 260 Ala.

26, 68 So.2d 537 (1953); *Robbs v. Illinois Rural Rehabilitation Corporation*, 313 Ill. App. 418, 40 N.E.2d 549 (1942). An accepted "Option to Purchase" is a contract by which an owner gives another the exclusive right or privilege to purchase his property for a stipulated price within a specified time, or if not specified, within a reasonable time. *County of San Diego v. Miller*, 119 Cal.Rptr. 491, 532 P.2d 139 (1975); *Harrison v. Puga*, 4 Wash.App. 52, 480 P.2d 247 (1971); *Mattox v. West*, 194 Ga. 310, 21 S.E.2d 428 (1942); *Whitelaw v. Brady*, 3 Ill.2d 583, 121 N.E.2d 785 (1954); *Morris v. Goldthorp*, 390 Ill. 186, 60 N.E.2d 857 (1945); 91 C.J.S. *Vendor & Purchaser* § 4 (1955); 77 Am.Jur.2d, *Vendor and Purchaser*, § 27 (1975).

The optionee does not get land or an interest therein or an agreement that he shall have land, but the right to call for and receive land if he so decides. An option contract is unilateral. The optionee has the right to purchase upon the terms and conditions named. *When the option is exercised,* the contract becomes bilateral and binds both parties and is enforceable at the instant of either party. *Robbs, supra.* "*Until exercised, the option creates no obligation to pay or perform in accordance with its terms.*" *Harrison, supra* 4 Wash.App. 52, 480 P.2d 252. As the Supreme Court said in *Northcutt v. McPherson*, 81 N.M. 743, 745, 473 P.2d 357 (1970):

. . . An option is the right of the optionee to comply or not comply *with the specific terms of the option*, at the sole choice and election of the optionee. [citations omitted.] *The necessity for unequivocal and unqualified expression of intention to exercise an option and affirmative performance of the expressed method of exercising it are well-established legal principles.* [citations omitted.] The language of the agreement itself controls as to what act or acts constitute an election to exercise an option. [Emphasis added.]

As stated in *Morris, supra* :

It is elementary that where one party gives an option to another, the acceptance, to be valid so as to conclude an

agreement or contract between the parties, must, in every respect, meet and correspond with the offer, *neither falling short of, nor going beyond, the terms proposed but exactly meeting them at all points and closing with them just as they stand.* [Emphasis added.] 390 Ill. 186, 60 N.E.2d 861.

Cabbell, an experienced real estate broker, prepared the "Option to Purchase." He knew what an "Option to Purchase" was. He was fully knowledgeable of the importance of including within it a requirement that a commission be paid if the option is exercised. He knew that as the "buyer" of property, he was not entitled to a commission for the purchase of the property. He knew that he was dealing directly with Master Builders to "buy" the land by option. He did not state in the "Option to Purchase" that he was acting as an agent of Master Builders in the sale of the property to himself, nor that he was entitled to a commission for a sale of the property to himself if he exercised the option. He knew that the "Option to Purchase" agreement executed 13 months after the sales agreement, was a new and independent contract. Prior thereto, he never mentioned the question of payment of a commission under the option.

When the time came to exercise the option, he refused to do so. Cabbell sought to vary its terms in a manner unacceptable to Master Builders. Mr. Cabbell asserts that he was "warranted in not thinking of (and hence not mentioning) the commission issue when the Option Agreement was prepared. *He was correctly assuming* that the prior Purchase Agreement was still in effect and that Jim Cabbell Agency would be paid a commission *when he exercised his option* . . . ." [Emphasis added.] Common sense dictates that if an option to purchase is *not* exercised, the right to acquire the land and a commission is lost. If Cabbell wanted to contest the right to a commission, his first duty was to exercise the option, comply with its terms, conclude the sale, then demand payment of a commission. He was experienced enough to know that if he was acting as broker for Master Builders and granted a third party an option, and the third party for any reason refused to exercise the option, Cabbell would retain the consideration paid but would not be entitled to a commission on the purchase price. See, Annot. *BROKER'S RIGHT TO COMMISSION FROM PRINCIPAL UPON PROCURING THIRD PARTY TAKING AN OPTION*, 32 A.L.R.3d 321 (1970).

Furthermore, if Cabbell assumes that he was operating under the prior Purchase Agreement and both instruments should be read together, then he was in a fiduciary relationship with Master Builders. He was subject to the burdens imposed upon him for the protection of Master Builders throughout the entire transaction as set forth in *Iriart v. Johnson*, 75 N.M. 745, 411 P.2d 226 (1965). Yet he denies he was in a fiduciary capacity.

Neither equity nor the law favors a litigant in search of justice who adopts conflicting positions in the trial and appeal of his case.

It appears under the sales agreement that Cabbell may yet sell himself the 14 lots in Unit "D" and deduct the amount of his commission. Whether a fair sale and purchase can be accomplished subsequent to this litigation, must be left in the laps of the parties.

Other points raised, not covered herein, are not meritorious.