**Certiorari Denied, November 23, 2011, No. 33,271**

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2012-NMCA-020

Filing Date: September 20, 2011

Docket No. 29,295

LYDIA and PATRICK NELLIS, for themselves
and all others similarly situated,

      Plaintiffs-Appellees,

v.

FARMERS INSURANCE COMPANY OF ARIZONA,

      Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Linda M. Vanzi, District Judge

Myers, Oliver & Price, P.C.
Floyd D. Wilson
Albuquerque, NM

Freedman, Boyd, Hollander,
Goldberg, Ives & Duncan, P.A.
David Freedman
Joseph Goldberg
Albuquerque, NM

Eaves & Mendenhall, P.A.
John M. Eaves
Karen Mendenhall
Albuquerque, NM

Law Office of Alan Konrad
Alan Konrad
Albuquerque, NM

Peifer, Hanson & Mullins, P.A.

1

Charles R. Peifer
Robert E. Hanson
Albuquerque, NM

Dennis M. McCary
Albuquerque, NM

for Appellees

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Andrew G. Schultz
Albuquerque, NM

Gibson, Dunn & Crutcher LLP
Theodore J. Boutrous, Jr.
Christopher Chorba
Los Angeles, CA

Skadden, Arps, Slate, Meagher & Flom LLP
Douglas B. Adler
Darrel J. Hieber
Los Angeles, CA

Raoul D. Kennedy
San Francisco, CA

for Appellant

## OPINION

**BUSTAMANTE, Judge.**

{1}     We are presented with yet another factual and legal "twist" in a series of class action cases challenging the manner in which insurance companies document and collect charges imposed when insureds opt to pay their premiums in installments rather than in a lump sum. After certifying the case as a class action, the district court entered summary judgment in favor of the Class on the merits of its breach of contract claim. Farmers Insurance Company of Arizona (Farmers) asked the district court to reconsider its decision, relying on *Nakashima v. State Farm Mutual Auto. Ins. Co.*, 2007-NMCA-027, 141 N.M. 239, 153 P.3d 664, an opinion issued by this Court after the district court entered its summary judgment in this case. The district court denied Farmers' motion. Concluding that *Nakashima* controls, we reverse.

## I.     THE FACTUAL SETTING

2

**{2}** The factual underpinnings of the case are deceptively simple. Farmers provides automobile insurance coverage to its customers. The parties agree that Farmers' standard practice is to offer policies with a six-month term and to require payment of the premium in a lump sum for the entire term. Customers who prefer—for whatever reason—to pay in smaller increments must make arrangements to pay their premium through Prematic Service Corporation (Prematic). It is "not possible for a Farmers' insured to pay" premiums on a monthly basis without going through Prematic. The parties also agree that insureds who choose to pay through Prematic must pay a monthly service charge or fee. The issues in the case revolve around the nature of this service charge or fee—whether it is itself a premium—and whether imposing the fee, whatever its nature, is allowable under the terms of the insurance policy Farmers issues.

**{3}** The Class is composed of persons who chose to pay their premiums on a monthly basis during the class period, which commenced in April 1997. The mechanics of how insureds enter into a Prematic agreement have changed over the years. The most dramatic change occurred in February 2001. Prior to that date insureds signed a written payment plan agreement with Prematic. Signature of the written agreement and payment of two months of premiums led to assignment of a Prematic account number which was in turn noted on the Declarations sheet of the insured's policy.

**{4}** Starting in February 2001, a written agreement was no longer required and thereafter rarely used. Instead, insureds were enrolled "in the Prematic monthly premium payment plan program by entering the insured's information utilizing the Farmers policy processing computer system." In both scenarios, the entire process was handled by Farmers agents. Once the insured's information was entered into the computer, the system assigned a Prematic account number which, as before, appeared on the insured's Declarations sheet labeled as such. But the first time the insured would see a Prematic Monthly Plan Agreement under the new procedure was with the first monthly bill. The monthly bills reflected the service charge as an amount separate from, and in addition to, the policy premium. The policy premium reflected on the initial bills was an amount equal to one-sixth of the six-month premium shown on the Declarations sheet. The Declarations sheet only included the six-month premium and a reference to "Prematic" next to the spot where "Total" premium would otherwise appear. The spot next to the line for "Fees" was blank. A representative example of the Declarations sheet is attached to this opinion.

**{5}** Whether the Prematic arrangement was embodied in a written document or simply noted in a computer program, the parties agree that the agreement was—in fact, had to be—in place *before* a Farmers agent would issue a policy of insurance.

**{6}** Once an insured made arrangements to pay monthly, Farmers issued a policy that included endorsement E0022, somewhat oddly titled the "Monthly Payment Agreement," a copy of which is attached to this Opinion. On its face, endorsement E0022 purports to amend the policy period to "one [c]alendar month"continuing for "successive monthly

periods if the premium is paid when due." Monthly premiums are subject to future adjustment to match the "then current rate on the semi-annual or annual anniversary of the policy." Endorsement E0022 also includes an integration clause: "This endorsement is part of your policy. It supersedes and controls anything to the contrary. It is otherwise subject to all other terms of the policy." The parties spend much time and effort disputing the meaning and effect of this language.

## II.    THE PROCEDURAL POSTURE

### A.    The Complaint

{7}    The "Class Action Complaint for Breach of Contract" was filed in April 2003. The complaint alleged that Farmers' insureds who "buy insurance on a monthly basis must pay service charges" to Prematic as agent for Farmers. The complaint also alleged that the service charges "are designed to cover the additional administrative expense generated" by buying insurance on a monthly basis. As such, the "service charges are a portion of the total cost of the insurance purchased" by Class members. There is no assertion in the complaint that Class members were not informed about the service charges before or at the time they agreed to buy insurance coverage from Farmers.

{8}    The complaint asserted that imposition of the service charges is a breach of contract because the "[p]olicies do not specify any service charge to be paid by a policyholder who buys insurance on a monthly basis." The only mention of "fees" in the policy is on the Declarations sheet and, according to the complaint, it provides "that there are no 'Fees' payable with respect to the Policies." Thus, the Class members "have been charged premium (i.e., service charges) in addition to the premium specified in the Policies."

{9}    In addition, the complaint asserts that the service charges constituted premium under New Mexico and Arizona statutory provisions which require that "premiums" be specified in the policy itself. *See* NMSA 1978, § 59A-18-3 (1984) (defining premium as "the consideration for insurance . . . by whatever name called"); NMSA 1978, § 59A-16-24(B) (1984) ("No person shall wil[l]fully collect as premium, administration fee or other charge for insurance or coverage any sum in excess of the premium or charge applicable thereto as specified in the policy[.]"); Ariz. Rev. Stat. Ann. § 20-1113(B)(6) (1954) (requiring that "[e]very policy shall specify . . . [t]he premium."). The complaint alleged that Farmers breached these statutory provisions when it imposed the service charges without including them in its policies and that "Farmers' violation of this statutory requirement is a breach of contract."

### B.    The Cross-Motions for Summary Judgment

{10}    After the district court certified the Class, the parties filed cross-motions for summary judgment, firm in their mutual conviction that Farmers' policy forms were not ambiguous and that there were no material issues of fact preventing a summary decision. The Class's

argument in support of summary judgment was essentially an expanded version of its complaint: that is, the service charges of necessity constitute premiums; they are not detailed in the policy itself; all premiums must appear on the policy itself; ergo, to impose them is a breach of the contract represented by the policy.

{11} The Class articulated three points in support of its position that the service charges constituted premiums. First, the Class refined its argument that the service charge was designed to pay for the "additional administrative and overhead expenses associated with monthly billing," thereby increasing the cost of insurance. It argued that this fact did not convert the charges into "installment fees" because Farmers' insureds were not buying six months of insurance at a time and then paying for it in six installment payments. Rather, under the terms of endorsement E0022, insureds were buying insurance in monthly increments. This feature, the Class argued, distinguished the facts here from the situation in cases like *Blanchard v. Allstate Insurance Co.*, 99-2460, pp. 6-7 (La. App. 1 Cir. 10/18/00); 774 So. 2d 1002, 1005-06, which held that Allstate's installment fees were not premium, in part because they were paid "for the privilege of paying the premium[s] over time."

{12} Second, the Class argued that, as a matter of contract law, there could be no consideration supporting imposition of the service charges, given that the policy allowed—or required—a month's premium for a month's worth of coverage. And, in any event, the Class argued, the parol evidence rule precluded proof of any agreements—including the Prematic agreement—which may have been entered into before the policies were issued.

{13} Third, the Class argued that Farmers could not escape liability simply because the service charges were paid to Prematic. The Class's position was that Prematic and Farmers were so inextricably linked through corporate ties and function—what could be more essential to the insurance business than efficient collection of premiums?—that they should be dealt with as one and the same entity. Or, the Class argued, at the very least, Prematic was Farmers' agent because policies could be cancelled for non-payment of service charges and because Prematic sent out notices of cancellation to Farmers' insureds. *See* NMSA 1978, § 59A-18-29(A) (1984) ("The insurer or agent shall give the named insured written notice of such cancellation[.]")

{14} Farmers argued in contrast that: (1) the service charges were not premium, either under the provisions of the policy itself or under New Mexico's statutory definition, and thus could not be considered consideration for insurance coverage, and (2) the Prematic invoices—which are referred to on the Declarations sheet—"are incorporated by reference into the policy documents and clearly and separately set forth the service fees which Plaintiffs claim were not set forth in the policy documents." Farmers used the reference to "Prematic" on the Declarations sheet to negate the potential effect of its policy's integration clause: "To construe the documents to exclude the Prematic invoices would be unreasonably inconsistent with the language in the policy documents. Construed together, as they must be, the policy documents set forth service fees due and payable."

**{15}** Interestingly, while Farmers asserted that Prematic was an entity "separate and apart from Farmers," it did not argue that this fact was of any particular consequence or material to the issues presented by the motions for summary judgment.

## C. The Trial Court's Decision

**{16}** Analyzing the case as framed by the parties—including the notion that the policy is not ambiguous—the district court found in favor of the Class. The district court correctly identified "[t]he primary areas of disagreement between the parties [to be] whether service fees are incorporated into the contract and whether they are considered 'premium.'" The district court first concluded that "the payment plan that imposes a service charge is not part of the insurance contract." The district court rejected Farmers' argument that the monthly invoices from Prematic, which did reflect the service charges, were or could be incorporated into the policy given that the invoices were not attached to the policy when delivered. Rather, the invoices were mailed some ten days after a policy is issued.

**{17}** The district court noted that the space next to the word "Fees" on the Declarations sheet is blank and concluded that this blank space "means there are no fees associated with this policy." The district court rejected Farmers' argument that the "Fee" line and the references to "Prematic" on the Declarations sheet serve "in the monthly payment context to remind the customer that he/she has chosen the monthly billing method and to refer to those documents for the 'Total' amounts payable." The district court emphasized that the policy itself did not contain any indication that the "total premium amount is a function of the number of payments made."

**{18}** The district court also concluded that the service charges constitute premiums and that Farmers' collection of them was a violation of Section 59A-16-24(B). The district court rested its decision on three grounds, each in response to Farmers' argument. First, the charges could not be installment fees because the policy as issued was for only one month, with no obligation to pay past each month. Thus, there was of necessity no continuing obligation to support the notion of installment payments. Second, the district court held that Farmers could cancel a policy for failure to pay service charges. As a result, "it would appear that the service charge is consideration for the insurance contract." Last, as in *Smoot v. Physicians Life Ins. Co.*, 2004-NMCA-027, ¶ 12, 135 N.M. 265, 87 P.3d 545, the service charges had the effect of increasing the cost of purchasing insurance and, as such, constituted premiums.

## D. The Motion for Reconsideration

**{19}** Farmers asked the district court to reconsider its ruling after this Court decided *Nakashima*. Farmers altered its argument considerably to match the *Nakashima* approach to the issues, emphasizing for the first time the significance of the Prematic agreement. Farmers noted that all of its insureds desiring to pay on a monthly basis had to enter into a Prematic agreement, including payment of an associated service charge, before a policy

would be issued and argued that the Prematic agreement was a contract separate from the policy. Farmers recognized it had changed its argument, noting that "[i]t is not surprising that the Prematic [a]greement was not the focus of the earlier cross-motions for summary judgment given that *Nakashima* established the pivotal significance of that separate agreement."

**{20}** The district court denied the motion to reconsider without a hearing, distinguishing *Nakashima* on its facts and reading it to be limited to the language of the policy at issue in that case. The letter ruling did not discuss the Prematic agreement.

## III. ANALYSIS

### A. Standard of Review

**{21}** All of the issues raised by this appeal are subject to de novo review. *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582 ("Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. . . . We review these legal questions de novo." (citation omitted)). If no material facts are in dispute, we "are not required to view the appeal in the light most favorable to the party opposing summary judgment." *City of Albuquerque v. BPLW Architects & Eng'rs, Inc.*, 2009-NMCA-081, ¶ 7, 146 N.M. 717, 213 P.3d 1146. This approach seems particularly appropriate where, as here, the parties file cross-motions for summary judgment. In addition, as in *Nakashima*, we are called on to construe an insurance policy as well as statutory provisions. Both issues are questions of law that we review de novo. *Richardson v. Farmers Ins. Co.*, 112 N.M. 73, 74, 811 P.2d 571, 572 (1991) ("The question of whether an ambiguity exists [in an insurance policy] is a question of law to be decided by the court."); *Smith & Marrs, Inc. v. Osborn*, 2008-NMCA-043, ¶ 10, 143 N.M. 684, 180 P.3d 1183 ("We review a district court's interpretation of an unambiguous contract de novo." (internal quotation marks omitted)); *Nakashima*, 2007-NMCA-027, ¶ 5; *Morgan Keegan Mortg. Co. v. Candelaria*, 1998-NMCA-008, ¶ 5, 124 N.M. 405, 951 P.2d 1066 (noting that interpretation of a statute is a question of law which an appellate court reviews de novo).

**{22}** We acknowledge one difficulty with the parties' assertion that there are no questions of fact preventing resolution of the case on a purely legal basis. On appeal Farmers argues that summary judgment was improper because Prematic—a separate entity that was not a party to the policy and is not a party in the case—collected and retained the service fees. Farmers made this factual assertion below. Nevertheless, the Class argues that the argument was not properly preserved.

**{23}** "To preserve an issue for review on appeal, it must appear that appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court." *Woolwine v. Furrs, Inc.*, 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct. App. 1987). "Absent [a] citation to the record or any obvious preservation, we will not consider the issue."

7

*Crutchfield v. N.M. Dep't of Taxation & Revenue*, 2005-NMCA-022, ¶ 14, 137 N.M. 26, 106 P.3d 1273. The rules of preservation are no different for review of summary judgment than for review of other final orders. *See Spectron Dev. Lab. v. Am. Hollow Boring Co.*, 1997-NMCA-025, ¶¶ 31-32, 123 N.M. 170, 936 P.2d 852. "We review the case litigated below, not the case that is fleshed out for the first time on appeal." *Id.* ¶ 32 (quoting *In re T.B.*, 1996-NMCA-035, ¶ 13, 121 N.M. 465, 913 P.2d 272 (alteration in original) (internal quotation marks omitted)).

**{24}** Farmers disputed the Class's argument that Prematic is its alter ego or agent and consistently described the two as distinct entities performing separate functions. But Farmers never argued that this asserted separateness made breach somehow impossible or even that the dispute about the nature of the relationship between Farmers and Prematic constituted a material issue of fact precluding summary judgment. Even in its motion for reconsideration relying on *Nakashima*, Farmers did not assert that the nature of its corporate and legal relationship with Prematic was a matter of consequence. We agree with the Class that Farmers failed to preserve the argument in the form it is made on appeal. Accordingly, this Opinion will treat Prematic and Farmers as if their legal relationship is not pertinent or material, in short, essentially as if they are the same entity.

## B.    Nakashima's New Approach

**{25}** We start our analysis with a review of *Nakashima*, a case with similar, though not identical, facts in which we agreed with the district court's conclusion that the plaintiff there "expressly agreed to the installment fees by entering into a separate contract with [the d]efendant to pay her premium in installments and further that the fees associated with paying in installments are not premium." 2007-NMCA-027, ¶ 8. We then consider whether the factual differences between the two cases counsel or require a different result here. Acknowledging that the differences alter the legal analysis somewhat, we yet conclude that summary judgment in favor of the Class was improper.

**{26}** The plaintiff in *Nakashima* was a long-time insured of State Farm under a series of six-month policies. *Id.* ¶ 2. At some point, she asked if she could pay her premium in installments rather than in a lump sum. *Id.* ¶ 3. She signed a form supplied by her State Farm agent that enrolled her in a payment plan which allowed her to pay her premium in monthly installments. The plan included an installment charge or fee that was imposed each month. *Id.*

**{27}** The parties in *Nakashima* agreed that the monthly installment fee was disclosed to the plaintiff and that she was aware of it. *Id.* ¶ 6. Further, the plaintiff in *Nakashima* did not dispute that the installment plan she agreed to was a separate agreement between her and State Farm. *Id.* ¶ 9. Despite adequate disclosure and the existence of the separate agreement, the plaintiff argued that State Farm breached its contract because the installment fees were actually part of the premium for the policy and, as such, they were required to be included in the "total premium" number stated on the policy. *Id.* ¶ 8. This requirement

8

flowed, the plaintiff argued, from the terms of the policy itself and from applicable statutory provisions. *Id.* ¶¶ 10, 22. Having rejected the plaintiff's arguments in *Nakashima*, we now examine our rationale and how it applies here. We start with our statutory analysis and then move to the contract issues related to the form and content of the policy.

**1.      Installment Payment Fees Are Not Premiums Under the Insurance Code.**

**{28}**    Mirroring the argument made by the plaintiff in *Nakashima*, the Class asserts that Farmers' collection of the Prematic installment charges is contrary to the Insurance Code. Specifically, the Class argues that the Code's definition of "premium" in Section 59A-18-3 covers installment fees. *Nakashima* squarely rejected this argument stating:

> We agree with the district court that [the d]efendant's installment fees are not consideration for insurance and that such fees are not charged in connection with the procurement of insurance. Rather, as discussed previously, the installment fees are associated with the privilege of paying a premium in installments and are not for the actual purchase of insurance itself.

2007-NMCA-027, ¶ 23. *Nakashima* also squarely rejected the argument that installment fees should be deemed an "administration fee," which must be specified in the policy under Section 59A-16-24(B). *Nakashima*, 2007-NMCA-027, ¶ 33.

**{29}**    There is nothing in the factual circumstances of this case that would render these holdings inapplicable here. The Class acknowledged in its complaint that the fees reflect and are intended to cover the increased costs associated with monthly billing and payment. This acknowledgment by itself is sufficient to bring this case within the rationale and holding of *Nakashima* with regard to the statutory basis of the claim. *See id.* (distinguishing administration fees that must be stated in a policy from "fees related to the payment option selected by the policyholders"). As the Class implicitly acknowledges in its briefing, other aspects of its argument—lack of consideration, interpretation, and parol evidence issues—are more properly dealt with as part of its common law breach of contract claims. Whatever the merits of these arguments, they do not affect the basic nature of the fees as charges flowing from the Class's decision to pay monthly rather than in a six-month lump sum.

**{30}**    *Nakashima* based its decision in part on the rather restrictive concept that insurance rates are "associated with the transfer of risk." 2007-NMCA-027, ¶ 20. The Class asks us to revisit this discussion in *Nakashima* because it improperly links the concept of premium to charges "directly relat[ed] to the insurer's actuarial risk of loss." We acknowledge that *Nakashima* connected premiums to the cost of risk. But the discussion was not intended to be comprehensive or to indicate that the cost of risk was the sole factor determining the level of premiums. Obviously, there are other factors at work—including administrative overhead and profit—which are folded into the final numbers quoted by insurers as premium. Acknowledgment of that fact does not alter the core concept that installment fees

generally—and the Prematic service charges in particular—are designed and intended to "cover the costs associated with a payment plan." *Id.*

**{31}**    The Class relies heavily on *Troyk v. Farmers Group, Inc.*, 90 Cal. Rptr. 3d 589 (Ct. App. 2009) in support of its position that the fees should be deemed premium under the statute.    *Troyk* involved the same family of companies, including Prematic Service Corporation, and the same monthly payment plan agreement we examine here. *Id.* at 598. *Troyk* examined whether the service charges constituted "premium" under California's statutory scheme, specifically Cal. Ins. Code § 381(f) (2005)—the California counterpart to Section 59A-18-3—and concluded that the Prematic service charges were premium under the statute. *Troyk*, 90 Cal. Rptr. 3d at 604. The court in *Troyk* decided that the conversion of the policy from a six-month to a one-month term by endorsement E0022 was decisive. The court concluded that the service charge tied to monthly payment expenses for a one-month policy should be included in the overhead charges normally included by insurer to arrive at a "premium" figure. *Id.* at 605-07. In so doing, the court in *Troyk* decided that the Prematic service charges were not true installment fees. *Troyk* distinguished *Nakashima* as a case involving "true installment payments of premium." *Troyk*, 90 Cal. Rptr. 3d at 608.

**{32}**    While we understand the analytical path the court in *Troyk* followed, we do not believe it can be squared with *Nakashima*. The most salient aspect of *Nakashima*'s approach is its recognition of a process by which insureds can enter into separate enforceable agreements for payment of premiums in a mode other than in a lump sum.    Unlike *Nakashima*, which focused on the process, *Troyk* focused on the end result of the agreement for monthly payments. The mechanism used in the policy to achieve and reflect the prior agreement allowing monthly payments does not transform the Prematic service charges into something inherent to the policy. As the Class agrees, the service charges are designed to cover the additional cost of monthly billing and payment. To adopt *Troyk*'s rationale, we would have to reverse *Nakashima*, at least in part. We see no reason to do so.

## 2.    There Is Consideration to Support the Prematic Service Charges

**{33}**    In *Nakashima*, State Farm and its insured apparently agreed on an insurance contract—usually for a six-month term—and the associated premium *before* any installment arrangements were made. 2007-NMCA-027, ¶¶ 3, 9. The installment fee and the monthly premium in *Nakashima* were not stated in the policy but were included in the installment plan form signed by the insured. *Id.* ¶ 3. The Declarations page of the policy referenced the payment plan once the plan was approved. *Id.* ¶ 11. Though *Nakashima* does not say explicitly, we infer that the policy continued to be for a six-month term even after an installment plan was approved.

**{34}**    Farmers' Prematic agreement takes a different approach. The parties agree that a Prematic agreement must be entered into before Farmers will issue a policy that allows monthly payments. Once the Prematic agreement is in place, Farmers issues a policy which, pursuant to E0022, is for successive one-month terms. The practical effect of this approach

10

is that Farmers' insureds pay for the "privilege of purchasing coverage in smaller quantities" rather than for deferring payment.

{35}   The Class, like the plaintiff in *Nakashima*, argues that the installment fees cannot be collected because the policy as issued reflects the installment plan and allows monthly payments and, as a result, there is no consideration to support the Prematic agreement. *Id.* ¶¶ 11,13.   In response to the first argument, *Nakashima* makes the common sense observation that "if Plaintiff had not entered into a separate agreement to pay her premium in installments, such references to a payment plan would not have appeared on her policy." *Id.* ¶ 11.   In response to the second argument, we held that the insurer's agreement to forgo a lump sum payment and the insured's gain of the right to pay monthly in exchange for a fee was adequate consideration. *Id.* ¶ 13.

{36}   We fail to see why our responses in *Nakashima* are inadequate to meet the Class's argument.   Endorsement E0022, the mechanism used by Farmers to reflect monthly payments, would not have been attached to the Class's policies absent a Prematic agreement being in place.   The Prematic agreement did not result in an increase of the six-month premium quoted; the premium simply got divided into six payments.   The Prematic agreement did include fees but, given that the gross amount of the premium did not change, the fees can only reasonably be seen as intended to cover the costs inherent to monthly rather than lump sum payments.

{37}   We conclude that the differences between the installment plan we dealt with in *Nakashima* and the Prematic agreement are not material and do not demand a different result.   The plans are structured differently but achieve the same ends for the same conceptual price.

3.      **The Parol Evidence Rule Does Not Prevent Enforcement of the Prematic Agreement**

{38}   The applicability of the parol evidence rule is the one area in which the factual differences between *Nakashima* and this case require a markedly different analysis.   The plaintiff in *Nakashima* asserted that the integration (or merger) clause of her policy prevented enforcement of any other agreements. *Id.* ¶ 12.   We rejected the argument, noting that integration clauses only cover "antecedent and contemporaneous agreements" and do "not foreclose the possibility of future agreements." *Id.*   Because in *Nakashima* the installment plan was entered into after the policy was agreed to, the parol evidence rule simply did not apply. *Id.*

{39}   The facts here are reversed:  the Prematic agreement must be entered into first and then the policy is issued.  Even though the two events—entry into the Prematic agreement and issuance of the policy—occur almost simultaneously, the sequence may be conceptually significant under the parol evidence rule.  As a result, *Nakashima*'s solution and rationale does not apply here and we must engage in a different analysis.

**{40}** Contract law is the law of exchange; it provides the set of rules that govern how and the extent to which agreements between parties are honored and enforced. The law of contract asks and answers the following questions: (1) Have the parties through their behavior created legally recognizable expectations in one another? (2) If so, how should those expectations be characterized and understood? (3) Have the understandings between the parties been faithfully carried out? (4) If not, what should the law do about it? The parol evidence rule touches on the first and second questions by providing substantive limits on the evidence parties are allowed to submit to prove the extent of the enforceable agreement they have reached. As such, it is advisable to be as precise as possible when stating and applying the concept. Application of the rule has proven—to put it mildly—difficult. "Few subjects connected with the interpretation of contracts present so simple and uniform a statement of principle, bedeviled by such a perplexing and harassing number of difficulties in its application, as the parol evidence rule." 4 *Samuel Williston, A Treatise on the Law of Contracts* § 632A, at 984 (3d ed. 1961).

**{41}** We begin with two definitions that express the rule from different perspectives but to the same end. The Restatement (Second) of Contracts § 213 (4th ed. 2008), expresses the concept in terms of "discharge":

> (1)    A binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them.

> (2)    A binding completely integrated agreement discharges prior agreements to the extent that they are within its scope.

**{42}** Corbin defines the rule in terms of the agreement and expectations of the parties. "When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." 6 Arthur Linton Corbin, *Corbin on Contracts* § 573, at 72 (interim ed. 1960). As Corbin notes, this is the essence of the so-called "parol evidence rule." Corbin, *supra* § 579 at 120 (internal quotation marks omitted).

**{43}** However expressed, the purpose of the rule is to prevent proof of understandings and agreements that the parties did not intend to survive. Application of the rule for any other purpose is not utile or proper.

**{44}** An agreement can be completely or partially integrated. Section 210 of the Restatement states:

> (1)    A completely integrated agreement is an integrated agreement adopted by the parties as a complete and exclusive statement of the terms of the agreement.

12

(2)     A partially integrated agreement is an integrated agreement other than a completely integrated agreement.

(3)     Whether an agreement is completely or partially integrated is to be determined by the court as a question preliminary to determination of a question of interpretation or to application of the parol evidence rule.

Restatement (Second) of Contracts § 210 (4th ed. 2008). Where there are no issues of fact concerning the wording of a document or the circumstances under which it was agreed to by the parties, courts will decide whether the document or documents are integrated and the level of integration as a matter of law. *See Denny's Rests., Inc. v. Sec. Union Title Ins. Co.*, 859 P.2d 619, 624 (Wash. Ct. App. 1993); *cf. also Mark V, Inc. v. Mellekas*, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993) (allowing the meaning of contract terms to be decided as a matter of law when the facts are not in dispute). In accord with the following discussion, we hold that the Farmers' policy is partially integrated and, as such, does not preclude proof and enforcement of the Prematic agreement.

**{45}**   As a factual matter, the Class relies on the merger clauses in the policy and endorsement E0022 to argue that the policy is fully integrated. The policy states, "This policy with the Declarations includes all agreements between you and us relating to this insurance. No other change or waiver may be made in this policy except by endorsement, new Declarations[,] or new policy issued by us." Endorsement E0022 states "This endorsement is part of your policy. It supersedes and controls anything to the contrary. It is otherwise subject to all other terms of the policy."

**{46}**   The Class also points out that the line next to the word "Fees" on the Declarations sheet is blank and argues that this means there are no fees imposed under the policy. We note that the Class does not acknowledge the two references to "Prematic" on the Declarations sheet and does not try to explain what they might mean. Rather, the Class asserts that the plain meaning of the policy forecloses any need for further interpretation.

**{47}**   As a legal matter, the Class seems to argue that insurance policies should be treated as completely integrated contracts as a matter of law. The Class quotes from *W. Farm Bureau Mutual Ins. Co. v. Barela*, 79 N.M. 149, 151, 441 P.2d 47, 49 (1968) that "[a] contract of insurance which has been embodied in a formal written instrument, termed a 'policy,' merges all prior or contemporaneous parol agreements touching the transaction." *Western Farm* restates the parol evidence rule, but it does not address what kind of evidence may be admissible to determine whether a particular contract is integrated or the extent and subject matter of the integration. The Class also seemingly seeks to exclude the most basic facts surrounding the issuance of the policies. In its Answer Brief, the Class acknowledges Farmers' argument that it would not have issued "month-to-month" policies to the Class without a Prematic agreement. Citing *Am. Inst. of Mktg. Sys., Inc. v. Keith*, 82 N.M. 699, 702, 487 P.2d 127, 130 (1971) for the proposition that extrinsic evidence concerning or related to the subject of a contract is inadmissible, the Class asserts "Even if Farmers'

13

position were factually correct, it would not help Farmers insofar as the parol evidence rule is concerned."

**{48}** The gist of the Class's argument is that the parol evidence rule requires exclusion of extrinsic evidence on the issue and that the question of integration can and should be resolved in a vacuum, reviewing the document in isolation. The Class's approach is contrary to New Mexico law, the Restatement, and other authority concerning interpretation of contracts.

**{49}** As a general matter, our courts have long recognized the value of extrinsic evidence to aid in the interpretation of contracts. New Mexico abandoned the strict plain meaning, "four-corners" approach to contract interpretation in *C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 508, 817 P.2d 238, 242 (1991) and *Mark V, Inc.*, 114 N.M. at 781, 845 P.2d at 1235. Even before the advent of *C.R. Anthony* and *Mark V*, however, our Supreme Court held that the parol evidence rule did not preclude the introduction of extrinsic evidence designed to "determine the circumstances under which the parties contracted and the purpose of the contract." *Levenson v. Mobley*, 106 N.M. 399, 403, 744 P.2d 174, 178 (1987); *see Wilburn v. Stewart*, 110 N.M. 268, 270, 794 P.2d 1197, 1199 (1990) (holding that parol evidence offered for the purpose of showing misrepresentation that conflicts with the terms of the contract is admissible in appropriate circumstances); *Empire W. Cos. v. Albuquerque Testing Labs., Inc.*, 110 N.M. 790, 794, 800 P.2d 725, 729 (1990) (holding that extrinsic evidence consisting of an earlier, rejected proposal was admissible as evidence of the purpose and scope of the contract actually entered into). These cases reflect agreement with Corbin's assertion that the "terms of any contract must be given a meaning by interpretation before it can be determined whether an attempt is being made to vary or contradict them." 5 Arthur Linton Corbin, *Corbin on Contracts* § 24.10, at 82 (rev. ed. 1998).

**{50}** The Class's reliance on *Keith* is thus misplaced. Under the approach utilized in *Levenson*, *Wilburn*, and *Empire West*, *Keith* would be decided differently; that is, the extrinsic evidence would have been admissible to help determine the level and scope of integration of the contract.

**{51}** The Restatement also recognizes that extrinsic evidence can be used to assess whether a writing has been adopted as an integrated agreement. Section 214 of the Restatement provides in pertinent part:

> Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish
>
> (a)  that the writing is or is not an integrated agreement;
>
> (b)  that the integrated agreement, if any, is completely or partially integrated;

14

(c)     the meaning of the writing, whether or not integrated[.]

Comment a. to the section observes that "[t]he preliminary determination is made in accordance with all relevant evidence, including the circumstances in which the writing was made or adopted. It may require preliminary interpretation of the writing." Thus, under the Restatement—and our case law—the full panoply of evidence concerning the Prematic agreement, the issuance of the policy with endorsement E0022, as well as all the features of the Declarations sheet and the rest of the policy is available to resolve the issue of the level and scope of integration of the policy.

{52}    Considering the totality of the circumstances, we conclude that the policy is only partially integrated; to do otherwise would be to thwart the intent of the parties. Fortunately for our analysis, the factual circumstances are not subject to dispute; we are not required to assess the credibility of the extrinsic evidence describing what happened before and after the policies were issued. The Class members requested the option to pay monthly. Farmers agreed to allow monthly payments if the Class members entered into a Prematic agreement. The Class members did so, and Farmers issued its policy. The policy included endorsement E0022 providing for a rolling one-month term. The policy also reflected the Prematic agreement twice on the Declarations sheet. In this context, it is not reasonable to conclude that either Farmers or the Class intended to preclude recognition and enforcement of the Prematic agreement.

{53}    Rather, it is more plausible that the parties intended the merger clauses to accommodate the Prematic agreement either: (1) as a separate agreement dealing with the payment of premium and accompanying monthly service charges—a view that would square with *Nakashima*'s treatment of installment plans in similar circumstances; or (2) as a separate agreement that is actually part of a larger comprehensive arrangement between the parties that should be construed together. *See Harp v. Gourley*, 68 N.M. 162, 170, 359 P.2d 942, 947 (1961); *Master Builders, Inc. v. Cabbell*, 95 N.M. 371, 373-74, 622 P.2d 276, 278-79 (Ct App. 1980). We need not decide here which approach is analytically preferable because either will suffice.

**CONCLUSION**

{54}    For the reasons stated above, we reverse the summary judgment entered by the district court and remand for dismissal of the case.

{55}    **IT IS SO ORDERED.**

_____
**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

15

_____

**JAMES J. WECHSLER, Judge**


_____

**CYNTHIA A. FRY, Judge**

**Topic Index for** *Nellis v. Farmers Insurance***, No. 29,295**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-SR | Standard of Review |
| | |
| **CP** | **CIVIL PROCEDURE** |
| CP-CA | Class Actions |
| CP-SJ | Summary Judgment |
| | |
| **CN** | **CONTRACTS** |
| CN-BR | Breach |
| CN-CS | Consideration |
| | |
| **EV** | **EVIDENCE** |
| EV-PE | Parol Evidence |
| | |
| **IN** | **INSURANCE** |
| IN-RA | Rates |

 F A R M E R S

## DECLARATIONS

COMPANY NAME:

FARMERS INSURANCE COMPANY OF ARIZONA, PHOENIX, ARIZONA
A STOCK INSURANCE COMPANY, HEREIN CALLED THE COMPANY

TRANSACTION TYPE: REINSTATEMENT

The Effective Date is from TIME APPLIED FOR. * * * * The policy may be renewed for an additional policy term of six months each time the Company offers to renew by sending a bill for the required renewal premium, and the insured pays said premium in advance of the respective renewal date. The Policy is issued in reliance upon the statements in the Declarations.

| INSURED'S NAME & ADDRESS | |
|---|---|
| PATRICK NELLIS<br>LYDIA NELLIS<br>9809 DOROTHY PL NE<br>ALB. NM 87111 3510 | POLICY NO: 16 14521 15 79<br>POLICY EDITION. 01<br>EFFECTIVE DATE: 07-31-2002<br>EXPIRATION DATE: 01-31-2003<br>EXPIRATION TIME 12:00 NOON Standard Time<br>PREMATIC NO HQ00246 |
| ISSUING OFFICE<br>P. O. BOX 29054<br>PHOENIX, AZ 85038 | AGENT Kimberly B Sanchez<br>AGENT NO: 16 10 323     AGENT PHONE: (505) 275-1000 |

### DESCRIPTION OF VEHICLE

| Year | Make | Model | Vehicle Identification Number | Rating Points Citations/Accidents |
|---|---|---|---|---|
| 1995 | GMC | PU SIERRA C1500 2WD | 1GTEC14H8SZ540374 | MAJOR  MINOR  ACCIDENTS<br>0 |

### COVERAGES      * ENTRIES IN THOUSANDS OF DOLLARS.      (SEE REVERSE SIDE FOR COVERAGE DESIGNATIONS)

| Bodily Injury | P.D. | Uninsured Motorist Bodily Injury | P.D | | Medical/ No Fault | Comprehensive Deductible | Collision Deductible | Towing Premium | Non-Auto |
|---|---|---|---|---|---|---|---|---|---|
| 30 * Each Person | 60 * Each Occurrence | 25 * NC Each Person | NC NC * Each Occurrence | XXX XXX XXX XXX | NC | 500 | 500 | NOT COV Other - Prem 4.10 | NC * Liab NC Medical |

### PREMIUM BY COVERAGE

| 123.20 | | XXXXXXXXX | | 41.10 | 76.50 | | 4.10 |
|---|---|---|---|---|---|---|---|

### ENDORSEMENT NUMBERS

E0022   E0107   E1140   E1154
E1200   E1248   E1401   H1105
S1606   S1609   S1654

### MESSAGES / RATING INFORMATION

CAR SYMBOL(V).
SEE ENDORSEMENT E0022.
PLEASURE USE:ANNUAL MI. MORE THAN 5000, AGE 60-69.
THE TERRITORY IS 14.
PLEASE CONTACT YOUR FARMERS AGENT FOR A FREE
FARMERS FRIENDLY REVIEW TO ENSURE THAT YOUR
FAMILY IS PROPERLY PROTECTED AND THAT YOU ARE
RECEIVING ALL OF THE DISCOUNTS/CREDITS AND
PACKAGE POLICIES AVAILABLE.

### DISCOUNTS / RATING PLAN

ANTI-THEFT
ACCIDENT-FREE
MULTIPLE CAR
HOMEOWNER
30/60

### POLICY ACTIVITY (Submit amount due with enclosed invoice)

| $ | |
|---|---|
| | Previous Balance |
| 244.90 | Premium |
| | Fees |
| | Payments or Credits |
| PREMATIC | Total |

ANY TOTAL BALANCE OF CREDIT $7.00 OR LESS WILL BE APPLIED TO YOUR NEXT BILLING BALANCES OVER $7.00 ARE DUE UPON RECEIPT.

LIENHOLDER OR OTHER INTEREST:

GMAC
PO.BOX 2525H
HUDSON OH 44236-0025

Countersignature

_John H...._
Authorized Representative

08-09-2002



## MONTHLY PAYMENT AGREEMENT

E0022
1st Edition

In consideration of the premium deposit, we agree to the following:

(1) The policy period is amended to one Calendar month. It will commence with the effective date shown in the Declarations.

(2) The policy shall continue in force for successive monthly periods if the premium is paid when due. The premium is due no later than on the expiration date of the then current monthly period.

(3) The monthly premium shall be subject to future adjustment. Such adjustment will apply the then current rate on the semi-annual or annual anniversary of the policy whichever is indicated in the Declarations as applicable.

This endorsement is part of your policy. It supersedes and controls anything to the contrary. It is otherwise subject to all other terms of the policy.

E-0022 1ST EDITION 7-86     1-96     E0022101

EXHIBIT B     TFF0025