IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2025-NMCA-014

Filing Date: March 17, 2025

No. A-1-CA-41783

JACE BANKERT, on behalf of himself
and other persons similarly situated,
known and unknown,

      Plaintiff-Appellee,

v.

10 ROADS EXPRESS, LLC,

      Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY
Francis J. Mathew, District Court Judge

Durham, Pittard & Spalding LLP
Caren I. Friedman
Justin R. Kaufman
Philip M. Kovnat
Santa Fe, NM

Werman Salas P.C.
Douglas M. Werman
John J. Frawley
Chicago, IL

for Appellee

Scopelitis, Garvin, Light, Hanson & Feary, P.C.
Charles Andrewscavage
Chicago, IL

YLAW, P.C.
Andrea K. Robeda
Albuquerque, NM

for Appellant

**OPINION**

**WRAY, Judge.**

**{1}**     Plaintiff is a former employee of Defendant 10 Roads Express, LLC (Company or the Company). This appeal primarily involves the applicability of 9 U.S.C. § 1 of the Federal Arbitration Act (the FAA) to an arbitration agreement (the Agreement) that Company sent to Plaintiff during the hiring process and that Plaintiff signed. The FAA "requires courts to enforce private arbitration agreements." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 108 (2019); *see* 9 U.S.C. § 2. The FAA, however, exempts certain contracts from mandatory enforcement, including the "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1; *see Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 109 (2001) (limiting "any other class of workers" to transportation workers).[1] Company appeals the district court's determination that the Agreement could not be enforced because it either lacked consideration or the transportation workers exemption applied. In the alternative, Company argues that the district court incorrectly determined that another term of the Agreement, a class action waiver, did not apply to the present circumstances. We hold that the promise to arbitrate in the Agreement was supported by consideration but is otherwise unenforceable based on the § 1 exemption, which applied because (1) the parties intended for the Agreement to be part of the contract for employment; and (2) the evidence sufficiently established that Plaintiff belonged to a class of transportation workers that was engaged in interstate commerce by participating in the transportation of goods in and out of New Mexico. As to the class action waiver, we conclude that we are without jurisdiction to review that matter in the present appeal. We therefore affirm.

**BACKGROUND**

**{2}**     Company employed Plaintiff as a commercial truck driver from November 2021 until December 2022. Plaintiff "operated exclusively intrastate, hauling loads on a dedicated route in New Mexico." On November 29, 2021, Plaintiff signed the Agreement, which included an introductory clause that stated, "In consideration of my employment with . . . Company . . . , and my receipt of compensation now and hereafter paid to me by Company, I, the Company Employee/Applicant, who signs this . . . Agreement . . . below (referred to as 'I' or 'me'), agree to the following" terms. Those terms include the promise to arbitrate "[c]laims for wages, benefits or other compensation due." Excluded from "[c]laims [c]overed by [t]his Agreement" were three specific categories of claims as well as "any other claim that is not subject to arbitration under state or federal law." Plaintiff was permitted to "opt-out of this Agreement by providing a written request to rescind to the Company within thirty (30) days of signing." The Agreement states that

> [t]his Agreement is not, and does not create, any contract of employment, express or implied. I acknowledge that, if I am employed by Company, my employment shall be "at-will," that is, Company or I may terminate my employment at any time, for any reason, either with, or without, cause,

---

[1]In this opinion, we generally refer to this provision of 9 U.S.C. § 1 as the "§ 1 exemption."

and that my "at-will" status may be modified only in a writing signed by the [p]resident of the Company.

The Agreement additionally required the parties to waive the right to bring a class action.

**{3}** Nevertheless, Plaintiff filed a class-action complaint in the district court against Company for violations of the New Mexico Minimum Wage Act, NMSA 1978, §§ 50-4-19 to -30 (1955, as amended through 2021). Company filed a motion to dismiss or stay and compel arbitration or to enforce the class action waiver. The district court denied Company's motion and found that (1) the Agreement lacked sufficient consideration; (2) the district court could not compel arbitration under the FAA because the § 1 exemption applied; and (3) the Agreement's class action waiver was unenforceable. Company appeals.

## DISCUSSION

**{4}** As our Supreme Court succinctly stated in a similar context, "all issues before us are subject to a de novo standard of review." *Cordova v. World Fin. Corp. of N.M.*, 2009-NMSC-021, ¶ 11, 146 N.M. 256, 208 P.3d 901; *see id.* (considering the denial of a motion to compel arbitration, whether the parties agreed to arbitrate, and the applicability and construction of an arbitration provision); *see also Strausberg v. Laurel Healthcare Providers, LLC*, 2013-NMSC-032, ¶ 25, 304 P.3d 409 (interpreting the FAA de novo). We briefly address the district court's determination that the arbitration provision of the Agreement was not enforceable for lack of consideration. The district court viewed the consideration for the promise to arbitrate to be Plaintiff's performance of work in return for Company's payment of wages. Mutual obligations to arbitrate, however, are sufficient to support an agreement to arbitrate. *See Juarez v. THI of N.M. at Sunset Villa, LLC*, 2022-NMCA-056, ¶ 15, 517 P.3d 918. Thus, to the extent that the promise to arbitrate was supported by consideration, the Agreement was enforceable. We next take up the § 1 exemption.

## I.      The Transportation Worker Exemption

**{5}** The party seeking to compel arbitration bears the burden to demonstrate a valid agreement to arbitrate exists, *Strausberg*, 2013-NMSC-032, ¶ 42, but if the moving party is successful, the burden shifts to the party resisting arbitration to prove any defenses, including the applicability of the transportation worker exemption, *see id.* ¶ 43 (establishing the shifted burden for affirmative defenses once the initial burden to prove the formation of a valid contract has been satisfied); *see also Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000) ("We have held that the party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue."). To determine whether Plaintiff met the burden to demonstrate that the § 1 exemption applies, we must analyze the terms of the § 1 exemption in the factual context of the present case.

**{6}** Specifically, we focus on the meaning of the statutory terms "contracts of employment" and "any other class of workers engaged in foreign or interstate commerce." *See* 9 U.S.C. § 1. The Supreme Court of the United States has explored to some extent what these terms mean. *See, e.g.*, *New Prime*, 586 U.S. at 113 (construing "contracts of employment"); *Circuit City Stores, Inc.*, 532 U.S. at 109 (construing "any other class of workers" to mean only transportation workers (internal quotation marks and citation omitted)); *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457-59 (2022) (determining whether the plaintiff with a particular job fell within the class of transportation workers engaged in interstate commerce). Company contends that Plaintiff did not establish that either term applies under the present circumstances, and we first consider whether the Agreement is a "contract of employment."

## A.      A Contract of Employment

**{7}** The parties' first dispute on this topic is about what evidence this Court should use to evaluate the Agreement to determine whether it is a "contract of employment." Relying on certain terms of the Agreement alone, Company notes that the Agreement contains no terms of work, states that it is not an employment contract, and was not mandatory. Company disputes that the Agreement can be construed with other documents to be a "comprehensive employment contract," which the district court appears to have done as demonstrated by its reference to *Neims v. Neovia Logistics Distribution, LP*, No. EDCV 23-716 PA, 2023 WL 6369780 (C.D. Cal. Aug. 10, 2023) (order). Instead, Company maintains that *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991) and *New Prime* foreclose evaluating the transaction as a "comprehensive employment contract" and that *Neims* was wrongly decided. Plaintiff disputes Company's assessment of *Gilmer*, *Neims*, and *New Prime* and directs us to the introductory clause of the Agreement as well as "extrinsic evidence" that the Agreement is part of a contract of employment. To understand the parties' arguments, we examine *Gilmer*, *Neims*, and *New Prime*, as well as other authorities that consider the statutory term, "contracts of employment." *See* 9 U.S.C. § 1.

## 1.      The Backdrop of Federal Case Law

**{8}** In *Gilmer*, the Supreme Court of the United States briefly addressed the § 1 exemption. *See* 500 U.S. at 25 n.2. An employment agreement required a newly hired employee to register with the New York Stock Exchange, and the registration application included an arbitration provision. *Id.* at 23. The employee was eventually fired and filed a lawsuit that alleged age discrimination. *Id.* In a footnote, the *Gilmer* Court concluded that the § 1 exemption did not apply because the record did not show and the parties did not argue that the employment agreement "contained a written arbitration clause." *Id.* at 25 n.2. Instead, the arbitration clause was in the securities registration application, "which [wa]s a contract with the securities exchanges, not with [the employer]." *Id.*

**{9}** According to Company, "lower courts have construed *Gilmer* to mean that, to be a 'contract of employment,' an arbitration provision must be contained in a broader

employment agreement" and cites *American Airlines, Inc. v. Mawhinney*, 904 F.3d 1114 (9th Cir. 2018), *Harrington v. Atlantic Sounding Co.*, 602 F.3d 113 (2d Cir. 2010), and *Garza Nunez v. Weeks Marine, Inc.*, Civ. Action No. 06-3777, 2007 WL 496855 (E.D. La. Feb. 13, 2007) (order). In each of those cases, however, the arbitration agreement was signed significantly after the employee was hired and after another event occurred that caused the employer to seek an agreement to arbitrate. *See Am. Airlines, Inc.*, 904 F.3d at 1116-17, 1122 (holding that it was "doubtful" that the § 1 exemption applied because the arbitration agreement was contained in a settlement agreement resulting from a post-termination retaliation complaint, was not "the contract under which [the employee] was hired," and did not set the terms and conditions of employment); *Harrington*, 602 F.3d at 115-16, 121 (concluding that the arbitration agreement, which was signed two years after hiring and after a workplace injury, was "not contained in a broader employment agreement between the parties" and was an "independent arbitration agreement" (internal quotation marks and citation omitted)); *Garza Nunez*, 2007 WL 496855, at *1, *3, *4 (concluding that an employee agreed to arbitrate tort claims after he was injured and rejecting the employee's argument that the post-injury arbitration agreement was a contract of employment because the arbitration agreement would not exist "but for" employment (internal quotation marks omitted)). Other courts have factually distinguished *Gilmer*'s footnote. *See Abram v. C.R. England, Inc.*, No. 20-cv-CV-20-00764, 2020 WL 5077365, at *3 (C.D. Cal. Apr. 15, 2020) (order) (noting that "the arbitration clause in *Gilmer* was part of a completely separate contract with a separate entity"); *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179, 2010 WL 4365478, at *3 (E.D. La. Oct. 25, 2010) (order) (distinguishing *Gilmer* and other cases because the agreement at issue "was signed well before [the p]laintiff's injury and was not an agreement between [the p]laintiff and a third party"). Despite disparate outcomes, these cases have in common the manner of analysis—in each, the court looks to the terms and circumstances of the agreement.

**{10}** In *Neims*, the district court used that analysis. The *Neims* court looked to the terms and circumstances of the parties' agreements, which included a letter offering employment. 2023 WL 6369780 at *4. The letter provided the terms of employment, established the at-will nature of the employment, and made the signing of a separate arbitration agreement "a condition" of employment. *Id.* "Moreover," quoting an earlier decision by the same court, the *Neims* court declined to interpret the § 1 exemption "'in a manner that completely eviscerates its purpose.'" *Id.* (quoting *Abram*, 2020 WL 5077365 at *4). The *Neims* court rejected the notion that Congress intended for "[a]n otherwise covered employer" to be able to circumvent the § 1 exemption "by simply presenting employees with a contract outlining all terms and conditions of employment, followed by a separate arbitration agreement, even if that agreement compels arbitration of employment disputes." 2023 WL 6369780, at *4 (internal quotation marks and citation omitted). Company contends that *Neims* "cannot be squared" with *Gilmer* and *New Prime*, and so we consider *New Prime*.

**{11}** In *New Prime*, the question was whether Congress intended for the § 1 exemption to exclude independent contractor agreements and apply only to the

employment contracts of employees. 586 U.S. at 113. At the outset, the Court explained that the § 1 exemption qualified the application of the FAA, because "[b]y the time it adopted the [FAA] in 1925, Congress had already prescribed alternative employment dispute resolution regimes for many transportation workers." *New Prime*, 586 U.S. at 110. As a policy matter, then, the Court observed that "it seems Congress 'did not wish to unsettle' those arrangements in favor of whatever arbitration procedures the parties' private contracts might happen to contemplate." *Id.* (quoting *Circuit City Stores, Inc.*, 532 U.S. at 121). The Court reviewed historical dictionaries, legal distinctions between employees and independent contractors, the statute's use of the term "worker," and public policy. *Id.* at 114-16. Ultimately, the Court could see in this authority "no evidence that a 'contract of employment' necessarily signaled a formal employer-employee or master-servant relationship." *Id.* at 116. The Court determined that "[w]hen Congress enacted the [FAA] in 1925, the term 'contracts of employment' referred to agreements to perform work." *Id.* at 121. This holding served to "respect the limits up to which Congress was prepared to go when adopting the [FAA]." *Id.* at 121 (internal quotation marks and citation omitted).

{12}    With this understanding of *Gilmer*, *Neims*, and *New Prime* in hand, we return to Company's argument. In Company's view, (1) if the *Neims* case were correctly decided, *Gilmer* "would have concluded that the separate arbitration agreement between the employer and employee was somehow part of a 'comprehensive' contract of employment and therefore exempt"; and (2) the *Neims* decision misinterpreted the purpose of the § 1 exemption and disregarded the historical policy explanation for 9 U.S.C. § 1 that was set forth in *New Prime*. We disagree with both arguments. First, the *Gilmer* Court determined that the arbitration agreement was not a contract of employment based on the circumstances of the transaction—the identity of the parties and the type of agreement that contained the arbitration provision. *See* 500 U.S. at 25 n.2. Similarly, in the present case, the relevant inquiry is whether the circumstances of the transaction establish that the arbitration agreement is part of an agreement to perform work. *New Prime*, 586 U.S. at 121.

{13}    Company's second argument fares no better. Relying on the *New Prime* Court's articulation of the likely historical purpose for the § 1 exemption, Company argues that Congress intended only to exempt the contracts of employment of workers who "were already subject to preexisting federally-regulated dispute resolution regimes." To the contrary, the *New Prime* Court, in its analysis, did not tie the meaning of the statutory terms to the likely historical purpose of the § 1 exemption. The holding was not that the § 1 exemption applied only to contracts of employment that were subject to existing federal dispute resolution procedures. Instead, the Court considered the semantic meaning of the "contracts of employment" language and the historical meaning of the word "employment" to determine that the § 1 exemption applies broadly to agreements to perform work. *New Prime*, 586 U.S. at 113-14, 121. Thus, to determine whether the § 1 exemption applies, we consider not whether the contract would have been subject to a "preexisting federally-regulated dispute resolution regime[]," as Company argues, but whether the contract is an agreement to perform work.

## 2.    The Application of State Contract Law

**{14}**    As of we have set forth, that the contract must be an agreement to perform work involved the application of federal law, but it is well established that contracts are construed according to state law. Federal law may identify the types of contract terms and the circumstances of the transaction that are relevant to whether an arbitration agreement is a contract of employment. For example, federal law directs that we consider the identity of the parties, the timing, and the mandatory nature of the provision. *See, e.g.*, *Gilmer*, 500 U.S. at 25 n.2 (considering the parties to the contract and the type of agreement); *see also Shanks v. Swift Transp. Co.*, Civ. Action No. L-07-55, 2008 WL 2513056, at *3 (S.D. Tex. June 19, 2008) (considering as a factor that the arbitration agreement was "mandatory company policy" and therefore a "component" of the "contract of employment" (internal quotation marks omitted)). State contract law, however, instructs where to look for those relevant considerations, how to construe the contract language, and how to discern the intent of the parties to the contract. *See Rivera v. Am. Gen. Fin. Servs., Inc.*, 2011-NMSC-033, ¶ 15, 150 N.M. 398, 259 P.3d 803 (considering "general principles of New Mexico contract law" in addition to the underlying substantive federal law).

**{15}**    In the construction of a contract under New Mexico law, "the touchstone . . . is to ascertain and apply the intent of the parties." *Levenson v. Haynes*, 1997-NMCA-020, ¶ 13, 123 N.M. 106, 934 P.2d 300. Our analysis begins with the plain language of the contract. We further may consider "evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance, in order to decide whether the meaning of a term or expression contained in the agreement is actually unclear." *Mark V, Inc. v. Mellakas*, 1993-NMSC-001, ¶ 11, 114 N.M. 778, 845 P.2d 1232 (internal quotation marks and citation omitted). "While Company suggests that "all inferences must be drawn in favor of arbitration," the Supreme Court of the United States has clarified that "the FAA's 'policy favoring arbitration' does not authorize federal courts to invent special, arbitration-preferring procedural rules." *See Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Instead, "[t]he federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Id.* A general rule that applies to all contracts under New Mexico law is "that in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in [the] course of the same transaction, are, in the eye of the law, one instrument, and will be read and construed together." *City of Clovis v. Sw. Pub. Serv. Co.*, 1945-NMSC-030, ¶ 33, 49 N.M. 270, 161 P.2d 878 (internal quotation marks and citation omitted); *see Juarez*, 2022-NMCA-056, ¶ 18. Based on the Agreement and its surrounding circumstances, we conclude that the parties intended for the Agreement to be part of the contract of employment.

**{16}**    The timing of the Agreement, the identity of the parties, and the purpose of the Agreement establish a single transaction. A letter dated November 23, 2021, included

the terms of employment (the offer letter).[2] The offer letter provides information about wages, taxes, benefits, and hours and informs Plaintiff that "[t]his offer is contingent upon the satisfactory outcome of your background checks, verification of right to work in the United States, reference checks, and *execution of agreements*." The offer letter warns that "[u]nsuccessful outcomes of *any* may result in your offer being revoked." According to the exhibits, Plaintiff received an initial set of documents as early as October 27, 2021, and the Agreement in another group of electronic documents provided by Company at least by November 29, 2021. The November 29, 2021 communication shows a grid listing the documents provided electronically to Plaintiff by Company.

| Pending Items | Pending Items | Recommended Completion Date | Final Due Date | Additional Info |
|---|---|---|---|---|
| 10 Roads - 7 Days Prior | 10 Roads - Driver 7 Day Log | 11-26-2021 | 11-26-2021 | Prerequisites Met |
| 10 Roads Arbitration - Non union Drivers | 10 Roads - Arbitration Non-Union | 12-06-2021 | 12-06-2021 | Prerequisites Met |

Plaintiff signed the Agreement on November 29, 2021. The introductory paragraph of the Agreement indicates that Plaintiff agreed to the terms "[i]n consideration of my employment with . . . Company . . . , and my receipt of compensation now and hereafter paid to me by Company." As of November 29, 2021, when Plaintiff signed the Agreement, he had not yet been scheduled to work. This evidence together demonstrates that the multiple communications "are, in the eye the law, one instrument" that should "be read and construed together." *See City of Clovis*, 1945-NMSC-030, ¶ 33 (internal quotation marks and citation omitted).

**{17}**     Company first argues that the extrinsic evidence supports a conclusion that the Agreement was a separate and standalone document. We disagree. Company points to an apparent six-day gap between date on the offer letter and the date the Agreement was signed and argues that the introductory paragraph of the Agreement is "entitled to no weight" and "merely acknowledges the parties' *pre-existing* employment relationship." Company's argument requires us to disregard the introductory statement, the contingency language in the offer letter, and the period of time during which Plaintiff's employment remained dependent on further action. Reading the documents together as a contract of employment accounts for this evidence.

**{18}**     The Company points to three additional facts to demonstrate that the parties did not intend for the Agreement to be a contract of employment. *See id.* ¶ 33 (conditioning the holistic view of the contract on any indication of a "contrary intention" (internal quotation marks and citation omitted)). Specifically, Company relies on the Agreement's

---

[2]Company challenges the admissibility of the declaration submitted by Plaintiff in response to the motion to compel arbitration because the declaration was unsworn and broadly states that the other exhibits are also inadmissible because they were "not already in evidence and are not self-authenticating." As we explain in the next section, the district court did not abuse its discretion under the circumstances to consider these exhibits. We therefore consider that evidence in our analysis.

opt-out provision, other limiting language, and absence of certain terms. We consider each point raised by Company.

**{19}** First, Company argues that the Agreement was not part of the contract of employment because it contained an opt-out provision and was not mandatory. The Agreement's opt-out provision, however, did not allow Plaintiff to opt out of arbitration at the time the Agreement was presented. Instead, the Agreement only permitted Plaintiff to opt out within thirty days of signing the Agreement by submitting a written request to rescind the agreement. Plaintiff was told that the employment offer was contingent on signing agreements, informed that the failure to do so may result in a withdrawn offer, and required to sign the Agreement before exercising the contractual right to rescind. Company presented evidence that no employee had ever suffered adverse action for choosing not to sign. But no evidence indicated that any employee had chosen not to sign the Agreement, and as Plaintiff pointed out at the hearing, the Agreement, by its terms, does not state that the employment offer is not contingent on acceptance. Under these circumstances, signing the Agreement in the first instance, at the start of employment, was mandatory, which supports a conclusion that the Agreement was part of the contract of employment.

**{20}** Second, Company cites the Agreement provision that states, "This Agreement is not, and does not create, any contract of employment, express or implied." In its entirety, the provision states,

> This Agreement is not, and does not create, any contract of employment, express or implied. I acknowledge that, if I am employed by Company, my employment shall be "at-will," that is, Company or I may terminate my employment at any time, for any reason, either with, or without, cause, and that my "at-will" status may be modified only in a writing signed by the President of the Company.

Read as a whole, this provision (1) relates to the distinction between "at-will" and contract employment; and (2) does not preclude the Agreement from being part of the contract of employment for the purposes of the § 1 exemption, even if it does not alone itself create a contract of employment.

**{21}** Third, Company contends that the Agreement, standing alone, lacks the "hallmarks of a traditional employment contract," because it contains no terms of employment and Plaintiff's "terms and conditions of employment would be identical" in the absence of the Agreement. For support, Company cites cases involving factually distinguishable agreements. *See Amos v. Amazon Logistics, Inc.*, 74 F.4th 591, 596 (4th Cir. 2023) (relating not to individual employment but to business services provided to another business); *In re Weeks Marine, Inc.*, 242 S.W.3d 849, 852, 855 (Tex. App. 2007) (considering the intent of the parties and the language used in a post-injury arbitration agreement; noting that the agreement neither addressed, defined, nor modified terms of employment; and concluding that the parties intended the agreement to settle claims for nonwage compensation); *see also Awe v. I & M Rail Link, L.L.C.*, No.

C04-3011-PAZ, 2007 WL 2572405, at *1, *4 (N.D. Iowa Sept. 4, 2007) (order) (involving arbitration agreements that were presented to fifteen existing employees to encourage those employees to stay with the company in the face of "a possible change in control or ownership" and that set forth rights and obligations should the plaintiffs continue their employment but did not establish or change terms or conditions of the existing employment). These cases consider the circumstances of the agreements and the parties' intentions, as we have already determined is appropriate. Considering all of the circumstances—including documents executed before Plaintiff started work that set forth the terms of employment as well as the parties' intentions manifested through the evidence presented—we conclude that the absence of employment terms in the Agreement itself is not determinative.

**{22}**     Company cites multiple cases to establish that courts have declined to apply the § 1 exemption because the arbitration agreement was not a contract of employment. These cases are each distinguishable either factually or as a matter of New Mexico law. *See Terrebonne v. K-Sea Transp. Corp.*, 477 F.3d 271, 274, 278 (5th Cir. 2007) (considering a post-injury settlement agreement); *Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656, 658-60 (5th Cir. 1995) (relying only on the fact of separate documents to reject an employee's argument that the § 1 exemption applied rather than considering the circumstances to determine whether the parties intended for the agreements to be read and construed together); *Cuneo v. Nat'l Delivery Sys., Inc.*, No. 20-P-1408, 2021 WL 5238716, at *3 (Mass. App. Ct. Nov. 5, 2021) (unpublished table decision) (concluding that no record evidence established that the employees were required to sign the arbitration agreements as a condition of employment and the employees provided no authority under 9 U.S.C. § 1 to support what the court viewed as an impermissibly "broad" construction of the term "contract of employment"); *Davila v. Roadway Moving & Storage, Inc.*, No. 22226/2019E, 2020 WL 3507495, at *1, *6 (N.Y. Sup. Ct. May 13, 2020) (mem. and order) (reviewing the applicability of the § 1 exemption to an optional arbitration agreement presented to an employee seven years into the employment relationship); *In re Mission Petroleum Carriers, Inc.*, No. 13-04-00550-CV, 2005 WL 326848, at *2 (Tex. App. Feb. 11, 2005) (unpublished decision) (involving an arbitration agreement that was part of an optional "health and safety plan" that allowed an employee to accept or reject plan benefits without changing the employee's status). The record in the present case includes evidence that the parties intended for multiple documents, including the Agreement, to form the contract of employment. Company's counterevidence does not "indicate a contrary intention." *See City of Clovis*, 1945-NMSC-030, ¶ 33 (internal quotation marks and citation omitted). As a result, we conclude that the Agreement should "be read and construed together" with other communications as the contract of employment. *Id.*

## B.     A Class of Transportation Workers Engaged in Interstate Commerce

**{23}**     Company next argues that Plaintiff did not meet the burden to establish that he belonged to a class of transportation workers engaged in interstate commerce (the transportation worker requirement). At the outset, Plaintiff contends that Company did not preserve the issue. *See* Rule 12-321(A) NMRA ("To preserve an issue for review, it

must appear that a ruling or decision by the trial court was fairly invoked."). In the motion to compel arbitration, Company asserted as a fact that Plaintiff "operated exclusively intrastate, hauling loads on a dedicated route in New Mexico" but did not argue that for this reason, the § 1 exemption was inapplicable. In response, Plaintiff did not dispute that he worked a dedicated New Mexico route but also set forth that while driving in New Mexico, he picked up and dropped off loads that were in transit between Phoenix, Arizona and Kansas City, Kansas. Though Company—apart from a footnote in the reply supporting the motion to compel arbitration—did not articulate the precise argument raised on appeal, we agree with Company that the factual argument in the district court preserved the overall issue. *See Soon v. Kammann*, 2024-NMSC-018, ¶ 13, 557 P.3d 104 ("[O]ur rules do not require the preservation of arguments, only issues."). We therefore consider Company's arguments regarding the admissibility of the evidence submitted and its sufficiency to establish the transportation worker requirement.

## 1. The Admissibility of Plaintiff's Evidence

**{24}** Company takes the position that Plaintiff submitted no admissible evidence on this issue. Plaintiff attached to the motion response an unsworn declaration as well as a number of other exhibits (the nondeclaration exhibits), including emails containing the forms, the offer letter, an email regarding route selection, and routes and schedules related to Plaintiff's contract. In the brief in chief, Company addresses only the unsworn declaration, but in reply to Plaintiff's reliance on the nondeclaration exhibits, Company contends the nondeclaration exhibits contain hearsay and are not self-authenticating. Because the parties agree that a motion to compel arbitration is a species of summary judgment motion, we resolve this evidentiary dispute under the rule governing summary judgment, Rule 1-056 NMRA.

**{25}** Rule 1-056 allows district courts to rely on documents attached to a summary judgment motion that were produced in discovery if the opposing party "did not object to their use in the motion for summary judgment and d[id] not argue the factual validity of the documents." *Alliance Health of Santa Teresa, Inc. v. Nat'l Presto Indus., Inc.*, 2007-NMCA-157, ¶ 16, 143 N.M. 133, 173 P.3d 55. It is also long-established that "[a] party must move to strike an affidavit that violates Rule [1-056(E)]." *Chavez v. Ronquillo*, 1980-NMCA-069, ¶ 20, 94 N.M. 442, 612 P.2d 234. In the present case, Company does not dispute the truth of the nondeclaration exhibits and did not object to the district court considering those exhibits. Further, Company did not move to strike the declaration and instead focused on its inadequacies. In the absence of objection or a motion to strike, the district court did not abuse its discretion to consider Plaintiff's evidence in order to determine whether the § 1 exemption applied. *See id.* ¶¶ 18-19 (explaining that Rule 1-056(E) "is mandatory in nature" but the rule does not require that the district court ignore "inadequate or defective affidavits . . . if no objection is made nor any motion is made to strike the testimony").

## 2. Plaintiff's Evidence to Meet the Transportation Workers Requirement

**{26}** Company contends that Plaintiff did not establish that he belongs to a class of transportation workers that is engaged in interstate commerce. Whether a class of workers is "engaged in interstate commerce," as required by the § 1 exemption, depends on whether the class of workers is "directly involved in transporting goods across state or international borders." *Saxon*, 596 U.S. at 457. A worker is "a member of a 'class of workers' based on what" the class of workers does for the employer, and not what the employer does generally. *Id.* at 456. In *Saxon*, the plaintiff worked for an airline loading and unloading goods that were transported across state and international borders. *Id.* The Court concluded that it was "plain that airline employees who physically load and unload cargo on and off planes traveling in interstate commerce are, as a practical matter, part of the interstate transportation of goods." *Id.* at 457. Workers who "handle goods traveling in interstate . . . commerce," like those who load cargo on an airplane, "plainly do perform activities within the flow of interstate commerce." *Id.* at 463 (internal quotation marks omitted).

**{27}** Plaintiff's evidence established that he was a member of a class of transportation workers engaged in interstate commerce. Plaintiff demonstrated that he was part of a class of truck drivers who worked a "Kansas City" contract and picked up loads at a travel center in Jamestown, New Mexico, drove to a truck stop in Santa Rosa, New Mexico, and "swap[ped]" the truck's trailer. The schedules show that when the drivers took the loads from Jamestown to Santa Rosa, the trucks had been "loaded" in Phoenix, Arizona. When the drivers took the loads from Santa Rosa to Jamestown, the "swap[ped]" trailer had come from at least as far away as Kansas City. Plaintiff's declaration also indicates the route stretched from Phoenix to Kansas City in both directions, and Company does not dispute this fact. Like the airline cargo loaders in *Saxon*, the truck drivers perform work entirely in one state but were nevertheless workers engaged in the flow of commerce between states. *Cf. id.* at 457. Even though the truck drivers did not load and unload vehicles—as the *Saxon* class did—by driving the goods across the state, the truck drivers were part of the transport of goods that traveled in interstate commerce and they performed activities that were within the flow of interstate commerce. *See id.* at 462-63.

**{28}** Company maintains that Plaintiff's evidence shows only his personal experience, which is irrelevant to the "class of workers" analysis, and that other courts have found that the § 1 exemption "does not apply to purely intrastate delivery work." For the first argument, Company focuses on Plaintiff's declaration and not the driver schedules that show that Plaintiff belonged to a larger class of workers who participated in moving goods in and out of New Mexico. While the declaration may focus on Plaintiff's experience, the schedules show the experience of the broader class of workers to which Plaintiff belonged.

**{29}** For the second argument, Company cites cases that involved plaintiffs who were delivery drivers or dispatchers and did not move goods through the channels of interstate commerce. *See Lopez v. Cintas Corp.*, 47 F.4th 428, 432 (5th Cir. 2022) (concluding that a plaintiff who belonged to a class of workers that "picks up items from a local warehouse and delivers those items to local customers" is "not so engaged in

interstate commerce as § 1 contemplates" (internal quotation marks and citation omitted)); *Hamrick v. Partsfleet, LLC*, 1 F.4th 1337, 1340 (11th Cir. 2021) (remanding for the district court to apply the proper test to determine whether the § 1 exemption applied to "drivers who make local deliveries of goods and materials that have been shipped from out-of-state to a local warehouse"); *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 799, 802-03 (7th Cir. 2020) (rejecting the argument that because some of the goods delivered originated out of state, last-mile food delivery drivers were "engaged *in the channels* of . . . interstate commerce" (internal quotation marks and citation omitted)); *Nunes v. LaserShip, Inc.*, No. 22-cv-02953, 2023 WL 6326615, at *3 (N.D. Ga. Sept. 28, 2023) (op. and order) (rejecting the plaintiff's argument that "last-mile delivery drivers are engaged in interstate commerce because the *goods* they transport have traveled interstate and remain in the stream of commerce until delivered"); *Teamsters Loc. Union No. 107 v. Madison Concrete Constr.*, Civ. Action No. 22-3721, 2023 WL 9052005, slip op. at *3 (E.D. Pa. Dec. 29, 2023) (determining that a shop manager who dispatched other drivers to projects out of state and occasionally performed his own job out of state did not belong to a class of workers that engaged in interstate commerce); *O'Bryant v. Flowers Foods, Inc.*, 629 F. Supp. 3d 377, 387-88 (D.S.C. 2022) (concluding that the § 1 exemption did not apply to a plaintiff who delivered baked goods intrastate based on the "delivery of goods that were produced out of state and previously moved across state lines"); *Bean v. ES Partners, Inc.*, 533 F. Supp. 3d 1226, 1230, 1236 (S.D. Fla. 2021) (declining to hold that the § 1 exemption applied to a plaintiff who made in-state deliveries of medications that were "manufactured all over the country"); *Bonner v. Mich. Logistics, Inc.*, 250 F. Supp. 3d 388, 391, 396-97 (D. Ariz. 2017) (deciding that the § 1 exemption did not apply to individuals who "performed deliveries on behalf of . . . a chain of automotive parts shops in Arizona" because the § 1 exemption "is meant to exclude the contracts of workers who are literally engaged in the process of moving goods across state and national boundaries—workers like seamen and railroad employees"). The cases cited by Company and *Saxon* instruct that the analysis depends not on the movement of the goods across borders, but rather on whether the plaintiff was a member of a class of workers "engaged *in the channels* of . . . interstate commerce." *See Wallace*, 970 F.3d at 802 (internal quotation marks and citation omitted); *Lopez*, 47 F.4th at 433 (explaining that local delivery drivers are not "actively engaged in transportation of those goods across borders" (internal quotation marks and citation omitted)); *Bean*, 533 F. Supp. 3d at 1234 (noting that other cases "relied on the *continuity* of the goods' travel—*viz.*, on their having not yet come to rest—rather than on their (interstate) provenance").

**{30}**     The evidence in the present case demonstrated just that. Plaintiff was not a member of a class of workers that picks up goods that have arrived from out of state and delivers them to their final destination in New Mexico. At a truck stop or travel center, Plaintiff picked up loads that originated outside of New Mexico and took those loads to another truck stop or travel center in New Mexico, where the load would be transported to another state. As a result, Plaintiff was a member of a class of workers that transports goods through New Mexico, to and from other states. *See* 9 U.S.C. § 1.

**C.     The Application of the FAA**

**{31}** Under the circumstances described, the Agreement is part of the contract of employment and Plaintiff belonged to a class of transportation workers engaged in interstate commerce. The § 1 exemption therefore applies to the Agreement. As a result, the arbitration provision in the Agreement cannot be enforced under the FAA.

## II. The Class Action Waiver and Jurisdiction

**{32}** In the alternative, Company contends that the district court should have enforced the class action waiver and required Plaintiff to litigate the claims individually. Company's argument implicates our limited jurisdiction in this matter. *See N.M. Dep't of Health v. Maestas*, 2023-NMCA-075, ¶ 10, 536 P.3d 506 ("Jurisdictional questions are questions of law which appellate courts review de novo. A jurisdictional defect may not be waived and may be raised at any stage of the proceedings, even sua sponte by the appellate court." (alterations, internal quotation marks, and citation omitted)).

**{33}** This Court's jurisdiction is generally limited to final orders. *See id.* ¶ 13 ("[T]his Court lacks jurisdiction to entertain an appeal from a nonfinal order." (alteration, internal quotation marks, and citation omitted)). The New Mexico Uniform Arbitration Act (NM UAA), NMSA 1978, §§ 44-7A-1 to -32 (2001), includes a provision for appeals. *See* § 44-7A-29. In relevant part, Section 44-7A-29 permits an appeal to be taken from "an order denying a motion to compel arbitration . . . as from an order or a judgment in a civil action." This Court has interpreted this provision, together with the statutory grant of jurisdiction over final orders found in NMSA 1978, Section 39-3-2 (1966), to mean that the Legislature intended for orders entered under the NM UAA to "be no more or less appealable than any other orders in civil actions." *Collier v. Pennington*, 2003-NMCA-064, ¶ 12, 133 N.M. 728, 69 P.3d 238. Thus, "when an order concerning arbitration is not one of the orders listed in [Section 44-7A-29] and does not fully resolve all the claims as to any one party, the question of whether it is immediately appealable as of right depends on whether the order is final." *Collier*, 2003-NMCA-064, ¶ 15. Whether an order is final, in turn, depends on whether "all issues of law and fact have been determined and the case disposed of by the district court to the fullest extent possible." *Maestas*, 2023-NMCA-075, ¶ 15 (alteration, internal quotation marks, and citation omitted); *see* Rule 1-054(B) NMRA.

**{34}** The order in the present case includes both a denial of Company's motion to compel arbitration and a determination that a portion of the Agreement, the class action waiver, is otherwise unenforceable and without consideration. The Company does not explain, and it is not apparent, how we have appellate jurisdiction over the district court's seemingly nonfinal determination that the class action waiver is unenforceable and without consideration. *See Ferebee v. Hume*, 2021-NMCA-012, ¶¶ 5, 15, 27, 485 P.3d 778 (involving a district court's decision on an issue that was immediately appealable by statute and also a related nonfinal decision). We therefore decline to review at this time the enforceability of the class action waiver or the consideration supporting that term of the Agreement. *See id.* ¶ 27.

## CONCLUSION

**{35}**   We affirm the district court.

**{36}   IT IS SO ORDERED.**

**KATHERINE A. WRAY, Judge**

**WE CONCUR:**

**JACQUELINE R. MEDINA, Judge**

**ZACHARY A. IVES, Judge**